No. 23-636

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

WATERKEEPER ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY,
CLEAN WATER ACTION, FOOD & WATER WATCH, SURFRIDER
FOUNDATION, ENVIRONMENT AMERICA, BAYOU CITY
WATERKEEPER, BLACK WARRIOR RIVERKEEPER, HEALTHY GULF,
SAN ANTONIO BAY ESTUARINE WATERKEEPER, TENNESSEE
RIVERKEEPER, and SAN FRANCISCO BAYKEEPER,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN,
Administrator, in his official capacity as Administrator of the United States
Environmental Protection Agency,

*Respondents.*

_____

Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

_____

**PETITIONERS' OPENING BRIEF**

_____

Jennifer Duggan, Deputy Director
Meg Parish, Senior Attorney
Sarah Kula, Staff Attorney
Environmental Integrity Project
1000 Vermont Ave NW, Suite 1100
Washington, DC 20005
(202) 263-4446
jduggan@environmentalintegrity.org
mparish@environmentalintegrity.org
skula@environmentalintegrity.org

*Counsel for Waterkeeper Alliance,
Center for Biological Diversity, Clean
Water Action, Food & Water Watch,
Healthy Gulf, Environment America,
Surfrider Foundation, Bayou City
Waterkeeper, Black Warrior
Riverkeeper, San Antonio Bay
Estuarine Waterkeeper, Tennessee
Riverkeeper, and San Francisco
Baykeeper*

Hannah Connor, Senior Attorney
Center for Biological Diversity
1411 K St NW, Suite 1300
Washington, DC 20005
(202) 681-1676
HConnor@biologicaldiversity.org

*Counsel for Center for Biological
Diversity*

ii

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................v

STATEMENT REGARDING ORAL ARGUMENT ........................... xii

FRAP 26.1 DISCLOSURE STATEMENT ........................................ xii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ..........................................................4

STANDING ......................................................................................4

STATEMENT OF THE ISSUES..............................................................6

STATEMENT OF THE CASE.................................................................7

  I.   The Clean Water Act and its Mandates for National Pollution Limits .........7

    *A.  EPA Must Establish ELGs Based on the Best Available Technology for All Nonconventional and Toxic Pollutants and All Point Sources*...................9

    *B.  EPA Must Establish Pretreatment Standards Based on the Best Available Technology for All Eligible Pollutants* .........................................................12

    *C.  EPA Must Establish Zero Discharge Limits Where Feasible*.................13

    *D.  EPA Must Tighten National Pollution Limits as Pollution Control Technology Advances*........................................................................................13

  II.  Existing National Pollution Limits for the Seven Industrial Categories .....14

  III.  EPA's Decisions Not to Revise the National Pollution Limits for the Seven Industrial Categories ..........................................................16

STANDARD OF REVIEW ...............................................................18

SUMMARY OF THE ARGUMENT ....................................................21

ARGUMENT ..................................................................................23

iii

I.    EPA's Decisions Not to Revise the ELGs for the Seven Industrial Categories are Arbitrary and Capricious ............................................................ 23

   A.   *EPA's Screening Level Reviews Were Not Related to Statutory Factors and Lack Evidentiary Support* ......................................................... 24

      1.   EPA's Screening Level Reviews are Unrelated to the CWA's Factors and Mandates ............................................................................. 25

      2.   EPA's Conclusions Regarding Pollution Discharges Lack a Substantial Basis in Fact ........................................................... 30

   B.   *EPA Failed to Consider Evidence Demonstrating Pollution Control Technologies Have Significantly Improved Since the 1980s* ......................... 38

      1.   EPA Failed to Consider Outperformance of ELGs ............................ 39

      2.   EPA Ignored its Own Studies Documenting Advances in Pollution Control Technologies ................................................................... 41

      3.   EPA Ignored its Own Rulemaking Records for ELGs in Nearly Identical Industrial Categories ..................................................... 43

      4.   EPA Continued to Allow Existing ELGs to Set BAT at BPT ............ 44

   C.   *EPA Failed to Consider Evidence that the Existing ELGs Do Not Address All Pollutants* ........................................................................... 47

      1.   EPA Failed to Consider its Own Findings that the ELGs for the Seven Industrial Categories Do Not Address Nutrient Pollution ............................ 49

      2.   EPA Ignored Record Information that the ELGs for at Least Four of the Industrial Categories Do Not Address Other Known Pollutants .......... 53

      3.   EPA Ignored Information that the Existing ELGs Do Not Control Pollutants in Industrial Stormwater ...................................... 58

   D.   *EPA Did Not Consider the Feasibility of Zero Discharge Limitations for the Seven Industrial Categories* ......................................................... 62

E.   *EPA Did Not Supply a Reasoned Basis for its Decisions to Not Revise the ELGs for the Seven Industrial Categories* ........................................................63

II.   EPA's Decisions Not to Revise the Pretreatment Standards for the Seven Industrial Categories are Arbitrary and Capricious .............................................65

CONCLUSION ....................................................................................................67

CERTIFICATE OF SERVICE ............................................................................69

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ..............................70

## TABLE OF AUTHORITIES

**Cases**

*Am. Coke & Coal Chems. Inst. v. EPA,*
    452 F.3d 930 (D.C. Cir. 2006) ...................................................................12

*Am. Frozen Food Inst. v. Train,*
    539 F.2d 107 (D.C. Cir. 1976).....................................................................8

*Am. Lung Ass'n v. EPA,*
    134 F.3d 388 (D.C. Cir. 1998)........................................................... *passim*

*Ass'n of Pac. Fisheries v. EPA,*
    615 F.2d 794 (9th Cir. 1980) ................................................... 20, 49, 61

*Beno v. Shalala,*
    30 F.3d 1057 (9th Cir. 1994) .....................................................................19

*BP Explor. & Oil, Inc. v. EPA,*
    66 F.3d 784 (6th Cir. 1995) .......................................................................45

*Chem. Mfrs. Ass'n v. EPA,*
    870 F.2d 196 (5th Cir. 1989) .....................................................................45

*Citizens Coal Council v. EPA,*
    447 F.3d 879 (6th Cir. 2006) .....................................................................13

*City and Cnty. of San Francisco v. EPA*,
    75 F.4th 1074 (9th Cir. 2023) ................................................................ 19, 39, 49

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Service*,
    67 F.4th 1027 (9th Cir. 2023) ...................................................................... *passim*

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ...................................................................... *passim*

*Ctr. for Food Safety v. Regan*,
    56 F.4th 648 (9th Cir. 2022) .......................................................................... 21, 65

*Daniels-Hall v. National Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010) .......................................................................... 16, 33

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S.Ct. 1891 (2020) ..................................................................................... 64, 67

*Env't Def. Fund, Inc. v. Costle*,
    636 F.2d 1229 (D.C. Cir. 1980) ............................................................................56

*Env't Health Trust v. Fed. Commc'ns Comm'n*,
    9 F.4th 893 (D.C. Cir. 2021) ...................................................................... *passim*

*EPA v. Nat'l Crushed Stone Ass'n*,
    449 U.S. 64 (1980) ...................................................................................... *passim*

*FCC v. Prometheus Radio Project*,
    141 S.Ct. 1150 (2021) ............................................................................................20

*Flyers Rights Educ. Fund v. FAA*,
    864 F.3d 738 (D.C. Cir. 2017) ............................................................................38

*Humane Soc. of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ............................................................... 30, 64, 67

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ..............................................................................................5

vi

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ................................................29

*Kennecott v. EPA*,
  780 F.2d 445 (4th Cir. 1985) ...................................... *passim*

*Louisiana Environmental Action Network  v. EPA*,
  955 F.3d 1088 (D.C. Cir. 2020) ............................... 11, 20, 48

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)  ............................................... 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)…… ................................................ *passim*

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002) ..................................... *passim*

*NRDC v. Costle*,
  568 F.2d 1369 (D.C. Cir. 1977) .................................. 12

*NRDC  v. EPA*,
  542 F.3d 1235 (9th Cir. 2008) ...............................5, 6

*NRDC v. EPA*,
  808 F.3d 556 (2d Cir. 2015) ................................39

*NRDC v. Train*,
  510 F.2d 692 (D.C. Cir. 1974) ...............................7

*O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*,
  92 F.3d 940 (9th Cir. 1996) ...............................54

*Our Children's Earth Found. v. EPA*,
  527 F.3d 842 (9th Cir. 2008) ................................ *passim*

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't. of Ecology*,
  511 U.S. 700 (1994) ...............................7

vii

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ....................................................... *passim*

*Tanner's Council of America v. Train*,
  540 F.2d 1188 (4th Cir. 1976) ...............................................64

*Texas Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir. 1998) .................................................45

*United Food & Com. Workers Union Local 751 v. Brown Grp.*,
  517 U.S. 544 (1996) ...............................................................6

*Waterkeeper All. v. EPA*,
  399 F.3d 486 (2d Cir. 2005) ...................................................56

**Statutes**

5 USC § 706(2)(A) ........................................................... 3, 18, 21, 23

33 USC § 1251(a)(1) ...............................................................1, 7

33 USC § 1251(a)(2) ...................................................................2

33 USC § 1311(b) ..................................................................7, 8

33 USC § 1311(b)(2) ...................................................................9

33 USC § 1311(b)(2)(A) ..................................................... *passim*

33 USC § 1311(b)(2)(C) ............................................................10

33 USC § 1311(b)(2)(E) ...................................................... 11, 45

33 USC § 1311(b)(2)(D) ............................................................10

33 USC § 1311(b)(2)(F) .............................................................11

33 USC § 1311(d) ....................................................................14

33 USC § 1314(a)(4)(A). .........................................................11

33 USC § 1314(b) .............................................................. 7, 8, 14

33 USC § 1314(b)(1)(B) .......................................................................45

33 USC § 1314(b)(2)(B) ....................................................... 26, 27, 45

33 USC § 1314(b)(3) ..................................................................... 13, 63

33 USC § 1314(g)(1) ............................................................... *passim*

33 USC § 1314(m) ..........................................................................14

33 USC § 1316(b) .........................................................................7, 8

33 USC § 1316(b)(1)(B) ..................................................................14

33 USC § 1317(a)(1) ........................................................................11

33 USC § 1317(a)(2) ............................................................. 9, 11, 57

33 USC § 1317(b)(1) ............................................................. 9, 13, 65

33 USC § 1317(b)(2) ............................................................. 7, 14, 65

33 USC § 1317(c) ................................................................ 7, 9, 13, 65

33 USC § 1342(a)(1) .........................................................................7

33 USC § 1342(p)(2)(B) ........................................................ 12, 59, 61

33 USC § 1362(11) ...........................................................................8

33 USC § 1369(b)(1) .........................................................................4

33 USC § 1369(b)(1)(A) ...................................................................4

33 USC § 1369(b)(1)(C) ...................................................................4

33 USC § 1369(b)(1)(E) ...................................................................4

**Federal Regulations**

40 CFR § 122.26(b)(14) ......................................................... 59, 60, 61

40 CFR § 125.3(a) ................................................................................. 9

40 CFR § 125.3(c)(2) ........................................................................... 9

40 CFR § 401.15. ................................................................................ 11

40 CFR Part 411 ................................................................................. 12

40 CFR Part 414 ................................................................ 15, 51, 58, 60

40 CFR Part 415 ................................................................ 14, 51, 58, 60

40 CFR § 415.62 ............................................................................ 44, 46

40 CFR § 415.63 ............................................................................ 44, 46

40 CFR Part 418 .............................................................................. 15, 51

40 CFR § 418.11(c) ............................................................................. 61

40 CFR § 418.12 ............................................................................ 44, 46

40 CFR § 418.13 ............................................................................ 44, 46

40 CFR Part 419 ......................................................... 12, 14, 43, 51

40 CFR § 419.11(g) ............................................................................ 61

40 CFR § 419.12 ............................................................................ 44, 46

40 CFR § 419.13 ............................................................................ 44, 46

40 CFR Part 421 ................................................................ 15, 51, 58, 60

40 CFR Part 421, Subparts B, C, F, M, P, Q R, T, V, X, Z, AA, AB, AC, AD ...... 44

40 CFR Part 434 ................................................................................. 12

40 CFR Part 437 ............................................................................ 43, 44

40 CFR § 437.1(d) .............................................................................. 44

x

40 CFR § 437.20 ...............................................................................43

40 CFR § 437.23 ...............................................................................43

40 CFR Part 450................................................................................12

40 CFR Part 455 .......................................................................... 15, 51

40 CFR § 455.20……………………………………………………….........32

40 CFR Part 463 ................................................................ 14, 51, 58, 60

40 CFR § 463.37 ...............................................................................54

**Federal Register Notices**

39 Fed. Reg. 12,832 (Apr. 8, 1974). ................................................ 51, 60

41 Fed. Reg. 20,582 (May 19, 1976) ....................................................61

47 Fed. Reg. 28,260 (June 29, 1982) .......................................... 41, 50, 60

48 Fed. Reg. 11,828 (Mar. 21, 1983) ....................................................60

49 Fed. Reg. 8,742 (Mar. 8, 1984) .......................................................51

49 Fed. Reg. 49,026 (Dec. 17, 1984). .............................................. 54, 57

50 Fed. Reg. 40,672 (Oct. 4, 1985) ......................................................51

52 Fed. Reg. 42,522 (Nov. 5, 1987).......................................... 50, 60, 57

58 Fed. Reg. 50,638 (Sept. 23, 1993)……………………………….....32

65 Fed. Reg. 81,300 (Dec. 22, 2000) ....................................................43

68 Fed. Reg. 71,023 (Dec. 22, 2003) ....................................................43

**Other Authorities**

5 CCR 1002-31, Table III ...................................................................................57

Consent Decree, *NRDC et al. v. Train,* 6 ELR 20588 (D.D.C. June 9, 1976). .......56

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners request that the Court schedule oral argument in this case.

Petitioners respectfully submit that oral argument would assist the Court in

disposing of this case.

## FRAP 26.1 DISCLOSURE STATEMENT

I certify, pursuant to Federal Rule of Appellate Procedure 26.1 that no petitioner is

in any part a publicly held corporation, a publicly held entity, or a trade

association, and that no publicly held corporation or other publicly held entity has

a direct financial interest in the outcome of this litigation, and the case does not

arise out of a bankruptcy proceeding or a criminal case in which there was an

organizational victim.

s:/ Meg Parish
Meg Parish, Senior Attorney
Environmental Integrity Project
1000 Vermont Ave NW, Suite 1100
Washington, DC 20005
mparish@environmentalintegrity.org

xii

## INTRODUCTION

National technology-based water pollution limits for large industries are a foundation of the Clean Water Act ("CWA"). These pollution limits are supposed to limit the harmful pollutants industries dump into our waterways and "force implementation of increasingly stringent pollution control methods" as technology advances to meet the CWA's goal of eliminating the discharge of pollutants into navigable waters. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1005 (5th Cir. 2019); 33 USC § 1251(a)(1).

Despite this, the U.S. Environmental Protection Agency ("EPA") has failed to update outdated technology-based water pollution limits ("National Pollution Limits") for some of the nation's largest industrial sources of nutrient and toxic pollution. Petroleum refineries; organic chemicals, plastics, and synthetic fibers manufacturing ("OCPSF"); inorganic chemical manufacturing; fertilizer manufacturing; pesticide chemical manufacturing; plastics molding and forming facilities; and nonferrous metals manufacturing ("Seven Industrial Categories") dump billions of gallons of wastewater into our rivers, streams, and lakes each year. Yet their national limits have not been updated since the early 1980s and 1990s and, as a result, have not kept pace with modern technologies that would limit harmful nutrient pollution or toxics like benzene, mercury, polycyclic

1

aromatic hydrocarbons (PAHs), selenium, per- and polyfluoroalkyl substances (PFAS), and heavy metals as the CWA requires.

EPA's failure to revise National Pollution Limits for the Seven Industrial Categories results in the discharge of millions of pounds of harmful pollution that could, and by law must, be prevented by currently available pollution control technologies. *See, e.g.,* 2-ER-0359, EPA-HQ-OW-2018-0618-0659, *The EPA's Review of Nutrients in Industrial Wastewater Discharge* at Table B-1 (Dec. 2020) ("*Nutrient Report*") (quantity of unregulated nutrient pollutants from different industries). This excess pollution is not allowed under the CWA, inconsistent with the CWA's goals of "fishable and swimmable" waterways, and a key reason why approximately 50% of the country's assessed waters are still too polluted to support intended uses like drinking water supplies and fish habitat. 2-ER-0500, EPA-HQ-OW-2021-0547-0434, *EIP Comments Regarding Plan 15 and EPA's Annual Review and Revision Process for Effluent Limitation Guidelines* at 1 ("*EIP Annual Review Comments*"); 33 USC § 1251(a)(2). EPA's failure to update these limits for the Seven Industrial Categories also disproportionately harms vulnerable communities because the majority of the facilities in these industries are clustered in environmental justice areas. *Infra,* p. 16.

On January 19, 2023, EPA excluded the Seven Industrial Categories for revision based on minimal screening level reviews that EPA specifically designed to avoid consideration of advances in technology and other technology-based factors that EPA must consider when making revision decisions. 3-ER-0614, EPA-HQ-OW-2021-0547-0500, *Effluent Guidelines Program Plan 15* at 5-1 ("Final Plan 15"). EPA also turned a blind eye to extensive record evidence documenting advances in wastewater treatment controls that are widely available, technologically achievable, and can significantly reduce the Seven Industrial Categories' nutrient and toxic pollution. EPA ignored ample record evidence that the Seven Industrial Categories' National Pollution Limits do not address all pollutants, as required by the CWA. EPA failed to provide any reasoned basis for its decisions to exclude the Seven Industrial Categories from revision. As a result, EPA's decisions not to revise the Seven Industrial Categories' National Pollution Limits are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 USC § 706(2)(A).

Waterkeeper Alliance, Center for Biological Diversity, Clean Water Action, Food & Water Watch, Healthy Gulf, Environment America, Surfrider Foundation, Bayou City Waterkeeper, Black Warrior Riverkeeper, San Antonio Bay Estuarine Waterkeeper, Tennessee Riverkeeper, and San Francisco Baykeeper ("Petitioners"

or "Waterkeeper") respectfully ask this Court to vacate EPA's January 19, 2023,
decisions for these Seven Industrial Categories and remand the decisions to EPA
for reconsideration consistent with the CWA.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under CWA Section 509(b)(1), which provides a
right to any interested person to seek judicial review of specific EPA actions in the
Circuit Court of Appeals of the United States for the Federal judicial district in
which such person resides or transacts business which is directly affected by such
action. 33 USC § 1369(b)(1). Waterkeeper's petition requests judicial review of
EPA's final decisions in Final Plan 15 that revision of the effluent limitations,
effluent limitation guidelines, standards of performance for new sources, and
pretreatment standards are not appropriate at this time for the Seven Industrial
Categories. Specific jurisdiction under CWA Section 509(b)(1) for review of these
decisions includes 33 USC §§ 1369(b)(1)(A), 1369(b)(1)(C), and 1369(b)(1)(E).

## STANDING

Petitioners have standing to bring this challenge. An association has standing
to bring suit on behalf of its members when: (1) one or more of its members would
have standing to sue in their own right; (2) the interests it seeks to protect are
germane to the organization's purpose; and (3) neither the claim asserted nor the

4

relief requested requires the participation of individual members in the lawsuit. *NRDC v. EPA,* 542 F.3d 1235, 1245–46 (9th Cir. 2008) ("*NRDC 2008*"); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342–43 (1977).

First, at least one member of each petitioning organization has standing to sue in their own right because that member has been injured by EPA's decisions for the Seven Industrial Categories. *Examples of Petitioners' Standing*, Pet. Ex. C (ECF No. 4.1). Petitioners' declarations show (i) an "injury in fact," (ii) a causal connection between the injury and the conduct complained of, and (iii) that it is likely that this injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). For example, members using waters polluted by the Seven Industrial Categories have been injured by: drinking water polluted by unregulated metals; fishing, boating, swimming, and watching aquatic life from rivers and bays polluted by unregulated toxics, nutrients, and stormwater; and being afraid or unable to do these activities because of this pollution. *Examples of Petitioners' Standing*, Pet. Ex. C (ECF No. 4.1). These injuries are fairly traceable to the Seven Industrial Categories' pollution and can be redressed by an EPA decision to revise and update the categories' National Pollution Limits.

Second, each organization's purpose includes protecting waters from industrial pollution so that their members and the public can drink safe water, fish,

safely consume fish and shellfish, recreate without getting sick (and fear of getting sick) from algae blooms or other pollutants, and enjoy the aesthetics of healthy waters and robust ecosystems. *Examples of Petitioners' Standing*, Pet. Ex. C at 3, 100, 112, 118, 143, 164, 178, 199, 206, 247, 279, 286 (ECF No. 4.1). Third, neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit because individualized proof is not required. *United Food & Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 544 (1996) (citing *Hunt*, 432 U.S. at 343). Finally, while these organizations all have standing, this Court has also held that "[o]nly one of the Plaintiffs must have standing to permit our review." *NRDC 2008*, 542 F.3d at 1248.

## STATEMENT OF THE ISSUES

1.      Whether EPA's decisions in Final Plan 15 not to revise the Seven Industrial Categories' ELGs are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

2.      Whether EPA's decisions in Final Plan 15 not to revise the Seven Industrial Categories' pretreatment standards are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

6

# STATEMENT OF THE CASE

## I.    The Clean Water Act and its Mandates for National Pollution Limits

The CWA sets a national goal of eliminating water pollution. 33 USC §
1251(a)(1). To achieve this goal, the CWA requires EPA to establish increasingly
stringent pollution limits for categories of industrial polluters and to revise these
limits to keep pace with technological advances. 33 USC §§ 1311(b), 1314(b),
1316(b), 1317(b)(2), 1317(c); *see also Sw. Elec. Power Co.*, 920 F.3d at 1005 (the
CWA is "'technology-forcing,' meaning it seeks to 'press development of new,
more efficient and effective [pollution-control] technologies'") (alteration in
original) (citing *NRDC v. EPA*, 822 F.2d 104, 123 (D.C. Cir. 1987)). By mandating
that EPA establish national minimum standards based on what is technologically
achievable, the CWA guarantees "that similar point sources with similar
characteristics" will achieve similar pollution-reduction targets regardless of their
location. *NRDC v. Train*, 510 F.2d 692, 709–10 (D.C. Cir. 1974) (citation omitted).
These National Pollution Limits are established by EPA through rulemaking and
must be incorporated into state and federal pollution discharge permits. 33 USC §
1342(a)(1); *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't. of Ecology*, 511 U.S.
700, 704 (1994).

7

For facilities discharging pollutants directly into surface waters, Congress directed EPA to promulgate pollution limits in the form of national, industry effluent limitation guidelines which form the basis for specific effluent limits in permits (collectively referred to herein as "ELGs").[1] 33 USC §§ 1311(b), 1314(b), 1362(11). ELGs must be based on specific technology-related factors, including "the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, [and] process changes." 33 USC § 1314(b)(2)(A). ELGs are frequently the basis for most permit limits. *See, e.g.,* 2-ER-0416, EPA-HQ-OW-2021-0547-0185, IL0002453 Permit at 3.

The CWA also requires national pollution limits for *indirect* industrial dischargers that send their wastewater to publicly owned wastewater treatment plants ("POTWs"). If indirect dischargers fail to appropriately reduce pollution, POTWs may be unable to treat their wastewater, resulting in excess pollution

------

[1] In practice, EPA develops ELGs and effluent limitations simultaneously "through the same procedures . . . and in the same document." *Am. Frozen Food Inst. v. Train*, 539 F.2d 107, 131 (D.C. Cir. 1976). Stricter standards for new sources, called new source performance standards, are also established at the same time. 33 USC § 1316(b).

8

discharges. To limit pollution from indirect dischargers, Congress directed EPA to publish guidelines that control and prevent the discharge of "any pollutant which interferes with, passes through, or otherwise is incompatible with [POTWs]." 33 USC § 1314(g)(1). In addition, Congress mandated that EPA establish pretreatment standards applicable to particular industries.[2] 33 USC §§ 1317(b)(1), 1317(c). ELGs and pretreatment standards are collectively referred to herein as "National Pollution Limits."

### A. EPA Must Establish ELGs Based on the Best Available Technology for All Nonconventional and Toxic Pollutants and All Point Sources

For each industrial point source category, EPA must set ELGs based on the best available treatment technology economically achievable ("BAT") to reduce nonconventional and toxic pollutants from all point source classes, except in limited circumstances not present here.[3] 33 USC §§ 1311(b)(2), 1317(a)(2); *Nat'l*

---

[2] For simplicity, Petitioners refer to pretreatment guidelines and pretreatment standards collectively as "pretreatment standards."

[3] EPA has limited discretion to decline or defer establishing ELGs for pollutants discharged by a point source category. *See* 40 CFR §§ 125.3(a), (c)(2) ("Technology based treatment requirements may be imposed ... [o]n a case-by-case basis."); *see also Sw. Elec. Power Co.*, 920 F.3d at 1021 (if EPA does not have enough data, EPA could decline to set ELGs and allow permitting authorities to set limits on their own). When EPA does not set a BAT limit for a pollutant, EPA must make specific record findings as to why an ELG is inappropriate. *Nat'l Wildlife Fed'n*, 286 F.3d at 566–67.

9

*Wildlife Fed'n v. EPA*, 286 F.3d 554, 566–67 (D.C. Cir. 2002). BAT must be based, at a minimum, "on the performance of the single best-performing plant in an industrial field." *Sw. Elec. Power Co.*, 920 F.3d at 1006 (citing *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 226 (5th Cir. 1989)); *see also Kennecott v. EPA*, 780 F.2d 445, 448 (4th Cir. 1985) ("In setting BAT, EPA uses not the average plant, but the optimally operating plant, the pilot plant which acts as a beacon to show what is possible."). Under certain circumstances, EPA may even use a technology not yet present in the industry. *Kennecott*, 780 F.2d at 453. BAT must represent the "gold standard for controlling water pollution from existing sources." *Sw. Elec. Power Co.*, 920 F.3d at 1003.

EPA's obligations to set BAT ELGs are established in CWA Section 301. Section 301(b)(2)(A) requires BAT ELGs "for pollutants identified in subparagraphs (C), (D), and (F) of this paragraph." 33 USC § 1311(b)(2)(A). Subparagraph C identifies all toxic pollutants referred to in a specific Congressional list. *Id.* § 1311(b)(2)(C). Subparagraph D identifies the additional toxic pollutants listed by EPA pursuant to Section 307(a)(2). *Id.* § 1311(b)(2)(D). And subparagraph F is then a catchall, identifying "all pollutants (other than those

10

subject to subparagraphs (C), (D), or (E) of this paragraph)."[4] *Id.* § 1311(b)(2)(F). In addition, CWA Section 307(a)(2) directs EPA to establish a list of toxics and requires "[e]ach toxic pollutant listed … shall be subject to," BAT ELGs. 33 USC §§ 1317(a)(1), (a)(2). This toxics list includes arsenic, benzene, cadmium, copper, cyanide, mercury, nickel, selenium, zinc, and other pollutants. 40 CFR § 401.15.

Together, these CWA provisions mandate that EPA establish BAT ELGs for *all* nonconventional and toxic pollutants discharged by a point source category. 33 USC §§ 1311(b)(2)(A), 1317(a)(1), 1317(a)(2); *see also* 2-ER-0545, *Earthjustice/EIP Fertilizer Comments,* at 4; *Louisiana Environmental Action Network ("LEAN") v. EPA*, 955 F.3d 1088, 1097 (D.C. Cir. 2020) (holding that, under a nearly identical Clean Air Act provision, "the obligatory periodic review and revision of 'emission standards' thus must ensure that each source category's standard imposes appropriate limits—not just on whatever subset of toxics the existing standard addressed, but on all the toxics the source category emits.").

---

[4] Subparagraph E establishes an exception for conventional pollutants controlled by the best conventional pollutants standard instead. 33 USC § 1311(b)(2)(E); *see also id.* § 1314(a)(4)(A).

Once EPA has decided to regulate an industrial category, like the Seven Industrial Categories, the CWA also requires that EPA establish BAT limits for all "classes of point sources," which includes industrial stormwater. 33 USC §§ 1311(b)(2)(A), 1342(p)(2)(B); *see also NRDC v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977) (holding EPA could not exempt industrial stormwater from permitting because the CWA required permits for point sources like industrial stormwater). EPA has established BAT limits for stormwater in some, but not all, industrial categories. *See, e.g.,* 40 CFR Parts 411, 419, 434, 450.

## B. EPA Must Establish Pretreatment Standards Based on the Best Available Technology for All Eligible Pollutants

"EPA is required to mandate pretreatment when a pollutant 'interferes with, passes through, or otherwise is incompatible with such works.'" *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 933 (D.C. Cir. 2006) (quoting Section 307). Similar to direct discharges of pollution, EPA must establish pretreatment standards for industrial categories that reflect BAT for pollutants from indirect industrial dischargers that interfere with or cannot be treated by POTWs.[5] 33 USC

---

[5] Similar to ELGs, EPA may decline to establish national pretreatment standards where EPA makes an express determination to control a pollutant on a case-by-case basis. *See supra* note 3.

12

§§ 1317(b)(1), 1317(c), 1314(g)(1); *Kennecott*, 780 F.2d at 455; 2-ER-0445,

Preliminary Plan 15 at Table 2-1.

### C. EPA Must Establish Zero Discharge Limits Where Feasible

When developing ELGs, EPA must "identify control measures and practices

available to eliminate the discharge of pollutants from categories and classes of

point sources, taking into account the cost of achieving such elimination of the

discharge of pollutants." 33 USC § 1314(b)(3).

### D. EPA Must Tighten National Pollution Limits as Pollution Control Technology Advances

"The Act . . . mandates a system in which, as available pollution control

technology advances, pollution-discharges will tighten." *Sw. Elec. Power Co.*, 920

F.3d at 1005*; see also* 2-ER-0546, EPA-HQ-OW-2021-0547-0462,

*Earthjustice/EIP Fertilizer Comments* at 5; 2-ER-0518, *EIP Petroleum Refinery*

*Comments* at 5. Once EPA promulgates initial BAT limits for an industrial

category, Congress intends these limits to become "progressively more stringent"

over time. *Citizens Coal Council v. EPA*, 447 F.3d 879, 883 (6th Cir. 2006); *see*

*also Our Children's Earth Found. v. EPA,* 527 F.3d 842, 850–51 (9th Cir. 2008)

("[T]he statute makes clear that the regulations must comport with technological

criteria that change over time.").

13

To keep pace with technology, Congress directed EPA to review existing National Pollution Limits and determine whether revision is appropriate at specific frequencies. EPA must: (1) at least annually, determine whether revisions to existing effluent limitation and pretreatment guidelines are appropriate; (2) every two years, establish schedules for the review and revision of effluent guidelines; (3) every five years, determine whether revisions of existing effluent limits are appropriate; (4) "from time to time, as control technology, processes, operating methods, or other alternatives change," revise pretreatment standards; and (5) "as technology and alternatives change," revise limits for new sources. 33 USC §§ 1311(d), 1314(b), 1314(g)(1), 1314(m), 1316(b)(1)(B), 1317(b)(2). Final Plan 15 is intended to fulfill all of these statutory "review and revise" obligations. 3-ER-0600, Final Plan 15 at 2-1.

## II.   Existing National Pollution Limits for the Seven Industrial Categories

EPA has not updated the Seven Industrial Categories' National Pollution Limits since the 1980s and 1990s:

| Industrial Category | Regulatory Cite | Promulgation | Last Revision | Age (Years) |
|---|---|---|---|---|
| *Inorganic Chemicals* | 40 CFR Part 415 | 1982 | Never | 41 |
| *Plastics Molding & Forming* | 40 CFR Part 463 | 1984 | Never | 39 |
| *Petroleum Refining* | 40 CFR 419 | 1974 | 1985 | 38 |

14

| | | | | |
|---|---|---|---|---|
| *Fertilizer Manufacturing* | 40 CFR Part 418 | 1974 | 1986 | 37 |
| *Nonferrous Metals Manufacturing* | 40 CFR Part 421 | 1976 | 1990 | 33 |
| *OCPSF* | 40 CFR Part 414 | 1987 | 1993 | 30 |
| *Pesticide Chemicals* | 40 CFR Part 455 | 1978 | 1998 | 25 |

2-ER-0500, *EIP Annual Review Comments* at 1; 2-ER-0547–0548, EPA-HQ-OW-

2021-0547-0457, *Earthjustice/EIP Fertilizer Comments* at 6–7.

The Seven Industrial Categories include some of the country's largest and

dirtiest plants, producing billions of pounds of pollution each year. 3-ER-0670,

EPA-HQ-OW-2021-0547-0656, EPA, *2021 Annual Review of Industrial*

*Wastewater Discharges*, at 3 (Nov. 2022) ("*Loading Analysis Review*"). This

pollution is clustered in low-income communities, communities of color, and

Indigenous communities. 65% of petroleum refineries, 64% of plastics moldings

and forming facilities, 63% of OCPSF facilities, 67% of inorganic chemical

manufacturers, 66% of pesticides manufacturers, and 55% of fertilizer

manufacturers are located within one mile of EPA-designated environmental

justice areas.[6] *See also* 2-ER-0517, EPA-HQ-OW-2021-0547-0439, *EIP Petroleum Refinery Comments,* at 4; 2-ER-0553, *Earthjustice/EIP Fertilizer Comments* at 19 (environmental justice impacts of petroleum refineries and fertilizer plants).

## III.    EPA's Decisions Not to Revise the National Pollution Limits for the Seven Industrial Categories

EPA issued Preliminary Effluent Guidelines Program Plan 15 in September 2021. 2-ER-0443, EPA-HQ-OW-2021-0547-0367, *Preliminary Effluent Guidelines Program Plan 15* at 1-1 (Sept. 2021) ("Preliminary Plan 15"). In the preliminary plan, EPA announced it would not revise the Seven Industrial Categories' ELGs or pretreatment standards. *Id.* at 5-5. EPA based these decisions on a screening level review comparing median pollution concentrations between industrial categories untethered from the CWA and specifically designed to avoid consideration of advances in technology and other technology-based factors EPA must consider when making revision decisions under the CWA. *Id.*

---

[6] These are areas at the 80th or higher national percentile for one or more of EPA's environmental justice indices. https://echo.epa.gov/facilities/facility-search; https://www.epa.gov/ejscreen. This Court may take judicial notice of the public contents of EPA's ECHO database and environmental screens pursuant to Federal Rules of Evidence 201(b)(2). *See Daniels-Hall v. National Educ. Ass'n,* 629 F.3d 992, 998–99 (9th Cir. 2010) (it is appropriate to take judicial notice of publicly available government websites when no party disputes their authenticity or accuracy).

Many of the Petitioners and others commented critically on these decisions and Preliminary Plan 15 more broadly.[7] These comments asked EPA to revise its outdated National Pollution Limits for numerous industries, including for the Seven Industrial Categories; asked EPA to consider technology and the adequacy of the existing ELGs in its revision decisions consistent with the CWA; warned EPA the preliminary plan's screening level review was inconsistent with the CWA; and raised environmental justice concerns about EPA's delays in revising limits. *See. e.g.,* 2-ER-0500, *EIP Annual Review Comments* at 1; 2-ER-0545, *Earthjustice/EIP Fertilizer Comments* at 4; *see also* 2-ER-0517, *EIP Petroleum Refinery Comments* at 4. EPA also was considering a 2019 Center for Biological Diversity petition asking for revisions to the OCPSF and plastics molding and forming ELGs and raising concerns about the industries' impacts on environmental justice communities. 5-ER-1053, 1055, EPA-HQ-OW-2021-0547-0664, *Center for Biological Diversity ("Center") Petition to Revise ELGs for Petroleum Refining*

---

[7] 2-ER-0498–0513, *EIP Annual Review Comments*; 2-ER-0514–0534, *EIP Petroleum Refinery Comments*; 2-ER-0542–0566, *Earthjustice/EIP Fertilizer Comments*; 3-ER-0567–0591, EPA-HQ-OW-2021-0547-0462, *Earthjustice/EIP Slaughterhouse Comments*; 2-ER-0535–0541, EPA-HQ-OW-2021-0547-0445, *Food and Water Watch Comments*.

17

*(Crackling and Petrochemicals) and OCSPF* at 28, 30 (July 23, 2019) ("*Center Plastics Petition*"); 2-ER-0451, Preliminary Plan 15 at 5-2.

EPA issued Final Plan 15 on January 19, 2023, without providing a substantive response to the comments or a reasoned basis for its decisions to exclude the Seven Industrial Categories. 3-ER-0614, Final Plan 15 at Section 5-1. In the Final Plan, EPA stated that it conducted a second screening level review comparing pollution loads between industrial categories that confirmed its previous decisions not to revise six of the Seven Industrial Categories. 3-ER-0614, Final Plan 15 at Section 5-1. EPA also conducted a brief additional "preliminary review" of the plastics molding and forming category, deciding not to revise its limits because "revisions to the ELG are unlikely to result in significant pollutant discharge reductions relative to the other point source categories discussed in this Plan." 3-ER-0624, Final Plan 15 at 5-11. For the reasons set forth below, EPA's decisions to exclude the Seven Industrial Categories are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), an agency action shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 USC § 706(2)(A). Agency action is arbitrary and

18

capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or is not in accordance with the law. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 52 (1983) ("*State Farm*"); *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994). EPA's decision must also be "rationally supported by record evidence." *City and Cnty. of San Francisco v. EPA*, 75 F.4th 1074, 1095 (9th Cir. 2023) (citing *State Farm*, 463 U.S. at 43). To survive arbitrary and capricious review, an agency must show that it examined "the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). This duty to explain is heightened when agency decisions are of national importance and affect public health, like the decisions here. *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 392 (D.C. Cir. 1998); *Nat'l Wildlife Fed'n*, 286 F.3d at 563. In such cases, "that agency has the heaviest of obligations to explain and expose every step of its reasoning." *Am. Lung Ass'n*, 134 F.3d at 392.

The CWA also constrains EPA's revision decisions. *See, e.g.*, *Our Children's Earth*, 527 F.3d at 851. Where, as is the case here, the agency's

19

decision is part of a regulatory review and revision process required by statute, courts will more closely examine the decision's consistency with the statute. This Court has determined that when EPA conducts a review of ELGs, "the Agency will be required to justify its regulations in terms of the more extensive data developed since the regulations were first promulgated." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 812 (9th Cir. 1980); *see also LEAN*, 955 F.3d at 1097 (evaluating EPA's review and revision decisions in light of Clean Air Act mandates); *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1160 (2021) (evaluating reasonableness of decision in light of statute's public interest purpose). In addition, this Court has held that ELG revision decisions, "although discretionary as indicated by the 'if appropriate' language, are constrained by the statute's mandate as to what 'such regulations' 'shall' accomplish." *Our Children's Earth*, 527 F.3d at 851.

It is the Court's duty to "'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.'" *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Service*, 67 F.4th 1027, 1039 (9th Cir. 2023) ("*Center v. USFWS*") (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This Court "'may not supply a reasoned basis for the agency's action that the

20

agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

EPA's obligations to conduct a lawful decisionmaking process are unchanged by limited resources. "[P]rioritizing pressing matters does not mean agencies have license to ignore the law. Simply put, '[a]bdication of responsibility is not part of the constitutional design.'" *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 658 (9th Cir. 2022) (quoting *Clinton v. City of New York*, 524 U.S. 417, 452 (1998)).

## SUMMARY OF THE ARGUMENT

The Seven Industrial Categories are major sources of water pollution. This pollution directly harms people and the environment, including Petitioners' members. Injuries suffered by Petitioners' members are fairly traceable to EPA's decision to not reduce pollution by revising the Seven Industrial Categories' National Pollution Limits. A favorable judicial ruling vacating EPA's decision would redress these injuries. Therefore, Petitioners have standing.

EPA's decisions not to revise the National Pollution Limits for the Seven Industrial Categories violate the APA because these decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 USC § 706(2)(A); *State Farm,* 463 U.S. at 43.

21

EPA's decisions not to revise the ELGs for the Seven Industrial Categories are arbitrary and capricious for numerous reasons. First, the screening level reviews that EPA solely relied on to exclude six of the Seven Industrial Categories from revision were unrelated to the CWA's factors and mandates for ELGs, and lack a substantial basis in fact. Second, EPA failed to consider extensive record evidence demonstrating that widely available pollution control technologies have significantly advanced since the ELGs for these industrial categories were last revised decades ago. Third, EPA failed to consider extensive record evidence demonstrating that the existing ELGs do not address all known pollutants discharged from the Seven Industrial Categories. Fourth, EPA did not consider the feasibility of zero discharge limitations for these industrial categories. Fifth, EPA did not supply a reasoned basis for its decisions to not revise the ELGs for the Seven Industrial Categories.

EPA's decisions not to revise the pretreatment standards for the Seven Industrial Categories are arbitrary and capricious because EPA failed to articulate any basis at all for its decisions.

For these reasons, Petitioners respectfully ask this Court to vacate EPA's decisions for the Seven Industrial Categories and remand them to the Agency for further consideration.

22

## ARGUMENT

### I.   EPA's Decisions Not to Revise the ELGs for the Seven Industrial Categories are Arbitrary and Capricious

EPA's decisions not to revise the ELGs for the Seven Industrial Categories are arbitrary and capricious for numerous, significant reasons. 5 USC § 706(2)(A). First, the screening level review EPA relied on to exclude the petroleum refining, inorganic chemical manufacturing, OCPSF, fertilizer manufacturing, pesticide chemicals, and nonferrous metals manufacturing categories from revision is entirely unrelated to the CWA's mandates for ELGs and lacks a substantial basis in fact. *See Our Children's Earth*, 527 F.3d at 851 (EPA's ELG reviews are constrained by the CWA's mandates as to what such regulations shall accomplish); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (agency decision must have a substantial basis in fact) ("*Center v. Zinke*"). Second, EPA failed to consider extensive record evidence demonstrating that pollution control technologies have advanced significantly since EPA last revised the Seven Industrial Categories' ELGs decades ago. *See, e.g.*, *Env't Health Trust v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 903 (D.C. Cir. 2021) (explaining that EPA must "justify its decision to retain its regulations" with more than "mere conclusory statements" where information demonstrates that the factual premises for EPA's prior decision have changed). Third, EPA failed to consider extensive record

23

evidence that the existing ELGs do not address pollutants discharged by the Seven Industrial Categories. *See, e.g.*, *id.* Fourth, EPA completely failed to consider the CWA's mandate to establish zero discharge limits where feasible. *State Farm,* 463 U.S. at 43. Finally, EPA did not, as required, offer any rational explanation for its decisions not to revise the ELGs for the Seven Industrial Categories. *Am. Lung Ass'n*, 134 F.3d at 392; *Nat'l Wildlife Fed'n*, 286 F.3d at 563.

### A. EPA's Screening Level Reviews Were Not Related to Statutory Factors and Lack Evidentiary Support

EPA's reliance on the screening level reviews to exclude six[8] of the Seven Industrial Categories is arbitrary and capricious because the reviews were completely unrelated to the CWA's factors and mandates for ELGs. *Our Children's Earth*, 527 F.3d at 851. In addition, the screening level reviews' conclusions about pollution discharges from the Seven Industrial Categories lack a basis in fact because they relied on a flawed EPA data tool, failed to consider

---

[8] The only category in this petition that was not excluded based on the primary screening level review is plastics molding and forming, where EPA conducted an additional "preliminary review" before deciding against revision because "revisions to the ELG are unlikely to result in significant pollutant discharge reductions relative to the other point source categories discussed in this Plan." 3-ER-0616, 0619–0625, Final Plan 15 at 5-3 to 5-12. This revision decision is also arbitrary and capricious. *Infra* p. 52, 54, 62.

pollution discharge information other than discharge monitoring reports ("DMRs"), and excluded pollutants in stormwater discharges. *Center v. Zinke*, 900 F.3d at 1067.

These APA violations are particularly significant because EPA relied on the preliminary plan's screening level review, the Cross-Category Review of Discharge Monitoring Report Concentration Data ("Concentration Ranking"), to exclude not only these six industries, but 90% of the industrial categories. 2-ER-0450, Preliminary Plan 15 at 5-1. EPA conducted a secondary screening level review ("Loading Analysis") before finalizing Plan 15 in which EPA concluded that the review "did not present any findings that altered EPA's decision on prioritization for industrial category reviews." 3-ER-0614, Final Plan at 5-1. Because EPA based its decisions not to revise six out of the Seven Industrial Categories on the screening level reviews, the screening level reviews themselves were required to address the CWA's factors and mandates for ELGs, yet they did not. *Our Children's Earth*, 527 F.3d at 851.

### 1. *EPA's Screening Level Reviews are Unrelated to the CWA's Factors and Mandates*

EPA's screening level reviews did not consider any of the CWA's factors and mandates for ELGs. EPA expressly designed its Concentration Ranking to compare only the median pollutant concentrations between industrial categories,

then excluded the industries with comparatively lower median pollution concentrations from revision. 2-ER-0451, Preliminary Plan 15 at 5-2. The Loading Analysis was intended only "to rank categories by total annual pollutant load discharged," and thus confirm that its Concentration Ranking was correct.[9] 3-ER-0614, Final Plan 15 at 5-1.

Reliance on these screening reviews was arbitrary and capricious. First, EPA's screening level reviews do not consider the CWA's mandatory factors for ELGs, including "the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, [and] process changes." 33 USC § 1314(b)(2)(B). Agencies must conduct a reasoned evaluation of relevant factors. *Center v. USFWS*, 67 F.4th at 1039. The CWA's mandatory factors for ELGs are highly relevant—this Court has stated that "the overall structure of the [CWA] strongly suggests that any review to

---

[9] While EPA has used similar but different ranking methods in the past, the Agency has not even promulgated regulations or developed specific guidance to ensure that ELG reviews are consistent from year to year, much less that they are consistent with the statutory factors EPA must consider when making revision decisions. *See, e.g.,* 4-ER-0995, *Response to Comments* at 252 (describing some of these methods).

determine whether revision is appropriate should contemplate the mandatory

technology-based factors." *Our Children's Earth, 527 F.3d at 851.*

Second, EPA's screening level reviews do not consider the CWA's relevant

mandates for ELGs, including ensuring existing ELGs reflect BAT for all

nonconventional and toxic pollutants from all point source classes, eliminating

discharges when feasible, and tightening ELGs as pollution control technology

advances. *Our Children's Earth*, 527 F.3d at 851; *Supra*, p. 9–14. In fact, the

screening level reviews do not mention or otherwise consider the existing ELGs at

all. 2-ER-0451, Preliminary Plan 15 at 5-2; 3-ER-0541, Final Plan 15 at 5-1.

Third, EPA did not just fail to consider relevant factors in its screening level

review process—it also relied upon *irrelevant* factors that Congress did not intend

EPA to prioritize when conducting its ELG reviews. *State Farm*, 463 U.S. at 43.

The stated goals of EPA's screening level reviews—comparing pollution

concentrations and loads across industrial categories—are not part of the statutory

factors for ELGs or CWA mandates EPA must consider. 33 USC §§

1311(b)(2)(A), 1314(b)(2)(B); s*upra*, p. 9–14, 19. The Fifth Circuit has flatly

rejected this approach where EPA is revising ELGs, holding that "no factor allows

the agency to consider the amount of pollutants generated by a one wastestream

*relative to other streams*." *Sw. Elec. Power Co.*, 920 F.3d at 1026 (emphasis

27

added); *see also id.* ("the Act does not permit the agency to set a BAT by playing one pollution source off against another"). If EPA may not consider the relative pollution reduction from one wastestream compared to another wastestream within a single industrial category, surely EPA may not base its decisions to exclude entire categories for revision solely on a ranking of pollution concentrations or loads across industrial categories. *Our Children's Earth*, 527 F.3d at 851.

Fourth, EPA ignored significant comments and other record information warning EPA that its Concentration Ranking was unrelated to the CWA's purpose for ELGs. For example, several commenters urged EPA not to rely upon its Concentration Ranking because it failed to evaluate whether existing ELGs reflect BAT, making it inconsistent with the CWA. 2-ER-0559, *Earthjustice/EIP Fertilizer Comments* at 18. The record also contains a 2012 U.S. Government Accountability Office ("GAO") report criticizing EPA for using screening reviews that did not consider technology. 2-ER-0320–0321, EPA-HQ-OW-2018-0618-0568, *GAO, Water Pollution: EPA Has Improved Its Review of Effluent Guidelines but Could Benefit from More Information on Treatment Technologies*, at 40–41 ("GAO Report"). There, GAO concluded that, without considering technology in the screening process, "EPA cannot be certain that the effluent guidelines program

28

reflects advances in the treatment technologies used to reduce pollutants in wastewater." *Id.*

Finally, EPA did not explain its decision to exclude six of the Seven Industrial Categories from revision based exclusively on its screening level reviews. The Agency did not substantively respond to comments about the inconsistencies between its Concentration Ranking and the statutory factors and CWA mandates applicable to ELGs. 4-ER-1004, *Response to Comments* at 261; *see also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) (agency must respond to significant comments in rulemaking). Nor did EPA otherwise explain why it chose to rely on screening level reviews that did not consider technological factors. 2-ER-0451, Preliminary Plan 15 at 5-2; 3-ER-0541, Final Plan 15 at 5-1; 4-ER-0995, *Response to Comments* at 252 (describing all of the screening reviews EPA has used over the years, but not explaining why the Agency chose its Concentration Ranking over a technology-based review in Plan 15).

EPA's failure to explain its reasoning is an independent APA violation. *Am. Lung Ass'n*, 134 F.3d at 392. When making decisions regarding ELGs, EPA has a heavy obligation to explain every step of its reasoning. *Am. Lung Ass'n*, 134 F.3d at 392; *Nat'l Wildlife Fed'n*, 286 F.3d at 563. EPA's failure to explain precludes

29

this Court "from undertaking meaningful judicial review," requiring a remand and "[a] satisfactory explanation." *Humane Soc. of United States v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010).

### 2. *EPA's Conclusions Regarding Pollution Discharges Lack a Substantial Basis in Fact*

Even if EPA's reliance on the two screening level reviews was rational and appropriate, which it was not, EPA's conclusions regarding which industrial categories had higher median pollutant concentrations and total loads lacked a substantial basis in fact because they relied on a flawed data tool, did not consider discharge information besides DMRs, and failed to consider pollutants in stormwater discharges. "Even when an agency is acting within its area of expertise," this Court 'need not defer to the agency when the agency's decision is without substantial basis in fact.'" *Center v. Zinke*, 900 F.3d at 1067 (quoting *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010)).

### i. *EPA's Reliance on the Water Pollution Loading Tool Crosswalk for Facility Classification Created Significant Errors*

Both of EPA's screening level reviews—the Concentration Ranking and the Loading Analysis—rely upon an EPA Water Pollution Loading Tool that categorizes which facilities belong to which point source categories, called a "crosswalk." 3-ER-0659–0661, EPA-HQ-OW-2021-0547-0635, *PSC Crosswalk*.

30

The EPA's reliance on this crosswalk created errors in both the Concentration Ranking and Loading Analysis because the crosswalk primarily uses Standard Industrial Classification ("SIC") codes to categorize facilities, which do not consistently match up with EPA's point source categories, leading to facilities erroneously excluded from the applicable industrial category and other facilities erroneously included. 3-ER-0541, Final Plan 15 at 5-1; 2-ER-0485, EPA-HQ-OW-2021-0547-0368, *EPA's Review of Industrial Wastewater Discharge Monitoring Report (DMR) Data for Preliminary Plan 15* at 3 (Sept. 13, 2021) ("*Concentration Ranking Review*"); 3-ER-0670, *Loading Analysis Review* at 3.

Petroleum refineries present a stark example of this problem. After a four-year detailed study on the refining industry, EPA identified 143 or fewer petroleum refineries in the United States and only 82 with DMR data. 1-ER-0183, EPA-HQ-OW-2018-0618-0349, *Detailed Study of the Petroleum Refining Category—2019 Report*, at Appendix A-1 (Sept. 2019) ("*EPA Refinery Study*"). But rather than use what the Agency already knew about the petroleum refining industry in its decisionmaking process, EPA instead identified and relied on *642* facilities as petroleum refineries in the Final Plan 15 Loading Tool, and *331* facilities as petroleum refineries in the Preliminary Plan 15 Concentration Ranking. 2-ER-0495, *Concentration Ranking Review* at 13; 3-ER-0670, *Loading Analysis Review*

31

at 3. At the same time, EPA excluded data from at least twenty known refineries in Texas because Texas collects daily maximum samples rather than the monthly averages used in the Concentration Ranking. 2-ER-0485, *Concentration Ranking Review* at 3. EPA cannot rationally review and make revision decisions for the petroleum refineries category based on a comparative analysis that includes effluent data from hundreds of facilities that are *not* petroleum refineries and excludes almost a quarter of the nation's *actual* refineries.

Likewise in the fertilizer manufacturing category, EPA's Concentration Ranking only considered pollutant discharge data from 35 fertilizer facilities, while EPA identified 123 fertilizer facilities in a prior report. 2-ER-0557, *Earthjustice/EIP Fertilizer Comments* at 16; *see also* 2-ER-0495, *Concentration Ranking Review* at 13; 2-ER-0393–0397, *Nutrient Report* at B-1. In the pesticide manufacturing category, facility categorization in the crosswalk is particularly confused because coverage for the category is triggered by a list of pesticide active ingredients that has not been updated since 1993. *See* 3-ER-0659–0661, PSC Crosswalk; 40 CFR § 455.20; 58 Fed. Reg. 50,638, 50,643 (Sept. 23, 1993). For instance, EPA classifies the facility covered by Permit AL0023272 as a pesticide manufacturing facility ("455") in the crosswalk, but Alabama categorizes it as OCPSF and inorganic chemicals manufacturing. *Permit Rationale, Permit*

*AL0023272* at 45 (Dec. 10, 2020).[10] Similar issues can be found across the Seven Industrial Categories.

These crosswalk mismatches are fundamental errors undermining the Concentration Ranking's factual basis. *Center v. Zinke*, 900 F.3d at 1067. While EPA attempts to minimize them as "an oversimplification," the errors mischaracterize the facilities and pollution from each industrial category, damaging the accuracy of comparisons between any category, including the Seven Industrial Categories. 3-ER-0670, *Loading Analysis Review* at 3. Moreover, EPA did not explain why it failed to take basic steps to double-check the factual bases for its conclusions, like comparing the number of facilities in the crosswalk against its own detailed studies or reviewing permits in categories known to be difficult to categorize, like pesticide manufacturing. *Center v. Zinke*, 900 F.3d at 1067.

---

10

http://lf.adem.alabama.gov/WebLink/DocView.aspx?id=104420952&dbid=0&cr=1. This Court may take judicial notice of the contents of this publicly-available government document pursuant to Federal Rules of Evidence 201(b)(2). *Daniels-Hall,* 629 F.3d at 998–99.

33

> ii.    *EPA's Sole Reliance on DMRs for Pollution Data Created Significant Errors in EPA's Screening Level Reviews*

Both of EPA's screening reviews rely solely on pollution data from 2019 DMRs. 2-ER-0451, Preliminary Plan 15 at 5-2; 3-ER-0541, Final Plan 15 at 5-1; 3-ER-0670, *Loading Analysis Review* at 3. DMRs are monthly sampling reports submitted by facilities, and they only include the data required to be reported under the facilities' permits. EPA's screening level reviews did not include other sources of pollution data such as permit applications (which include information about far more pollutants) or studies from EPA and other sources. 2-ER-0451, Preliminary Plan 15 at 5-2; 3-ER-0541, Final Plan 15 at 5-1.

By relying just on DMR data to characterize each industry's pollution profile, EPA's screening reviews were unlikely to accurately identify each industry's pollution output and compare pollutant concentrations and loads across point source categories. Permits rarely limit or monitor all pollutants discharged at a facility precisely because EPA has failed to update ELGs to control all pollutants. Indeed, while permits must include the category's ELGs, the Seven Industrial Categories are missing numerous ELGs for known pollutants, including nutrients and toxics like arsenic and mercury. *Infra*, p. 47. And while permits can include monitoring or limits for pollutants without ELGs, this varies widely across states and will depend on whether state water quality standards exist for the pollutant,

34

specific state regulations, and the individual permit writer's judgment. *Compare, e.g.,* 7-ER-1453, Permit CA0005550 at 7 *with* 6-ER-1398, Permit LA0006041 at 2 (California refinery permit requires selenium, copper, and dioxin monitoring, Louisiana refinery permit does not).

Further, when only a few facilities in a category monitored for a pollutant, EPA based the Concentration Ranking's median pollution concentration on that small quantity of data. *See, e.g.,* 2-ER-0434–0435, EPA-HQ-OW-2021-0547-0243, *Cross-Category Concentration Analysis 2019 DMR Data*. For instance, the Concentration Ranking used only nine out of 331 facilities to determine petroleum refineries' median concentration for total nitrogen. *Id.* Medians based on such a small number of facilities are unlikely to represent the entire category's pollution.

Additionally, using only DMR data skewed the Loading Analysis even more significantly. If a pollutant was not monitored at a facility, it was not counted in the Loading Analysis at all. 6-ER-1294, 1301–1302, EPA-HQ-OW-2018-0618-0398, *Technical Users Background Document for the Loading Tool* at 3-12, 3-19 to 3-20. This means two facilities in different states discharging the *same* quantity of a pollutant would have different pollution loads if one state requires the pollutant to be monitored while the second state does not, as is common. *See, e.g.,* 7-ER-1453, EPA-HQ-OW-2018-0618-0577, Permit CA0005550 at 7; 6-ER-1398, EPA-HQ-

OW-2018-0618-0332, Permit LA0006041 at 2 (California refinery permit requires monitoring for more pollutants than the Louisiana refinery permit).

Given the many pollutants without ELGs for the Seven Industrial Categories—much less others—and how this skews pollution comparisons, EPA's screening level reviews could not accurately represent the pollution discharged by each industry, or accurately compare pollution between industries. This in turn made EPA's reliance on these reviews for conclusions about categories' pollution (and the Agency's subsequent revision decisions) irrational and "without substantial basis in fact." *Center v. Zinke*, 900 F.3d at 1067. One commenter emphasized this point, warning EPA that "[w]ithout a representative dataset, EPA's apparent logic—that ELGs must be adequate if EPA's DMR data indicate that an industry's pollutant concentration levels or pollution load is relatively limited—does not hold." 2-ER-0539, *Food and Water Watch Comments* at 5.

The irrationality of EPA's sole reliance on DMR data is compounded by GAO's specific identification of this problem more than ten years ago, noting that EPA's use of data just "for those pollutants that facilities' permits require them to monitor … may affect the agency's ability to accurately rank industrial categories for further review..." 2-ER-0308–0309, GAO Report at 28–29. EPA knew that

36

using only DMR data undermined the accuracy of its screening level conclusions, yet did not change course or explain itself.

> ### iii.    *EPA Excluded Pollutants in Stormwater Discharges*

EPA excluded all stormwater flows from the Concentration Ranking. 2-ER-0487, *Concentration Ranking Review* at 5. EPA offered no reason why stormwater pollutants were unimportant in an analysis aimed at comparing pollution concentrations across industrial categories. *Id.* Moreover, EPA *did* include stormwater flows in the Loading Analysis but did not explain the reason for the difference. 3-ER-0614, Final Plan 15 at 5-1; 3-ER-0669, *Loading Analysis Review* at 2. The CWA's ELG provisions, which apply without exception to classes of point sources, provide no basis for excluding industrial stormwater. 33 USC § 1311(b)(2)(A); *Supra*, p. 12.

EPA's decision to exclude such a large industrial wastestream from a comparison of pollution concentrations undermined the Concentration Ranking's conclusions. 2-ER-0451, Preliminary Plan 15 at 5-2. For example, the Concentration Ranking would not highly rank a category whose treated process water had low concentrations of pollution but whose untreated stormwater had high concentrations of the same pollutants. This is arbitrary and capricious. *See.,*

37

*e.g.*, *Flyers Rights Educ. Fund v. FAA*, 864 F.3d 738, 744 (D.C. Cir. 2017)
(rejecting the use of overly narrow studies as the basis for decision making).

Without an explanation from EPA, EPA's exclusion of stormwater from the
Concentration Ranking was irrational. *See Center v. Zinke*, 900 F.3d at 1069
(without the agency providing a reason, the court is precluded from meaningful
judicial review).

### B. EPA Failed to Consider Evidence Demonstrating Pollution Control Technologies Have Significantly Improved Since the 1980s

The Plan 15 record is replete with information that shows—not
surprisingly—that widely available pollution control technologies have advanced
significantly since the 1980s, and the ELGs for the Seven Industrial Categories are
decades out of date. Yet EPA chose to ignore this information. 2-ER-0451,
Preliminary Plan 15 at 5-2; 3-ER-0625, Final Plan 15 at 5-12. Specifically, EPA
ignored evidence that: (1) facilities within the Seven Industrial Categories are
outperforming the ELGs; (2) EPA's own studies document the widespread
availability of technologies that dramatically reduce pollution from the Seven
Industrial Categories; (3) EPA has established more comprehensive ELGs based
on more advanced technology for similar categories; and (4) a number of existing
ELGs still have BAT limits set at a far less stringent technology standard that is no
longer allowed under the CWA.

The Agency must consider this relevant record information, which is directly related to CWA factors and mandates that EPA is required to consider when making revision decisions. *Supra,* p. 9–14, 19. By ignoring this evidence, EPA failed to base its decision on the relevant factors, consider an important part of the problem, and support its decision with record evidence. *State Farm,* 463 U.S. at 43; *Center v. USFWS*, 67 F.4th at 1039; *City and Cnty. of San Francisco*, 75 F.4th at 1095; *see also NRDC v. EPA*, 808 F.3d 556, 573–74 (2d Cir. 2015) ("*NRDC 2015*") (EPA cannot turn a blind eye to significant information).

### 1.  *EPA Failed to Consider Outperformance of ELGs*

EPA failed to consider extensive record evidence that refineries, fertilizer manufacturers, and plastics molding and forming facilities are outperforming their current ELGs. In other words, the existing ELGs allow these industries to discharge more pollution than currently achieved by the industries' average or best performers, meaning the existing ELGs no longer reflect BAT. *See Kennecott*, 780 F.2d at 448 (EPA is to use the optimally operating plant when setting BAT). "Indeed, seeking to find systems that are capable of doing better than the current standard is in keeping with the technology-forcing aspect of the CWA." *NRDC 2015*, 808 F.3d at 571. For example, several groups submitted detailed comments showing that refineries are outperforming their existing ELGs. 2-ER-0522, *EIP*

*Petroleum Refinery Comments* at 9. EPA failed to respond to this information, simply stating that "[t]he Petroleum Refining Category did not rank high compared to other categories in the 2019 and 2020 annual rankings." 4-ER-1011, EPA-HQ-OW-2021-0547-0659, *Comment Response Document for Preliminary Plan 15* at 268 ("*Response to Comments*").

Similarly, several groups provided information that a large Nebraska plant was significantly outperforming the current fertilizer manufacturing ELGs. 2-ER-0556, *Plan 15 Fertilizer Comments*, at 15. EPA responded that it would not revise the category because it did not rank highly enough in the Concentration Ranking. 4-ER-1013, *Response to Comments* at 270; *see also* 2-ER-0556, *Earthjustice/EIP Fertilizer Comments* at 15. The Agency offered a half-hearted promise to do better in the future, noting that "[a]s EPA conducts future annual reviews, it will take into consideration the commenter's suggestions for improving its assessment of the Fertilizer Manufacturing industry such as … [c]omparing current discharges to permit limits to better assess the BAT." 4-ER-1013, *Response to Comments* at 270.

EPA even ignored outperforming facilities identified by the Agency itself. For example, EPA noted that "[r]eported average concentrations of TSS, oil and grease, and $BOD_5$," from the plastics molding and forming category, "were an order of magnitude below the current ELG," but then never considered whether

40

this made revision more appropriate. 3-ER-0710, EPA-HQ-OW-2021-0547-0657,

*2021 Preliminary Review of Industrial Point Source Categories* at 31 (Jan. 2023)

("*Plan 15 Preliminary Review*").

### 2. *EPA Ignored its Own Studies Documenting Advances in Pollution Control Technologies*

EPA had at its disposal two EPA studies demonstrating significant advances

in technology since the Seven Industrial Categories' ELGs were last updated

decades ago: a membrane wastewater treatment systems study and the Nutrient

Report. 2-ER-0407–0413, EPA-HQ-OW-2021-0547-0172, EPA, *Preliminary*

*Technology Review: Membrane Wastewater Treatment Systems* (Sept. 2021)

("Membrane Study"); 2-ER-0349–0406, Nutrient Report.

EPA's Membrane Study documents that membrane filtration is now

widespread, listing 21 industries, including OCPSF, petroleum refining, and

nonferrous metals manufacturing, where the technology is already being used to

reduce pollutants like metals and organic chemicals. 2-ER-0407, Membrane Study

at 1. The study provides strong evidence for revision of the inorganic chemical

manufacturing ELGs, where EPA explicitly rejected the use of membrane filtration

as infeasible in 1982. 47 Fed. Reg. 28,260, 28,262 (June 29, 1982). The study is

also relevant to whether ELGs should be tightened for industries whose ELGs are

41

based on less advanced technology but whose facilities are using, or could use, membrane filtration.

Similarly, the 2020 Nutrient Report shows common combinations of biological nutrient removal, nitrification/denitrification, and other technologies can significantly reduce nutrient concentrations for the Seven Industrial Categories, particularly fertilizer manufacturing plants, plastics molding and forming facilities, and petroleum refineries. 2-ER-0393–0401, *Nutrient Report* at Tables 3-2, B-1, and B-2; *see also* 2-ER-0521, *Earthjustice/EIP Fertilizer Comments* at 8 (discussing fertilizers' nutrient load). This information is directly relevant to an evaluation of whether the Seven Industrial Categories' ELGs should be revised to include nutrient limits that reflect BAT.

In Plan 15, EPA discussed the Membrane Study generally but never considered the study's relevance to revision decisions, even for inorganic chemical manufacturing. 3-ER-0625, Final Plan 15 at 5-12. Similarly, while EPA generally discusses the Nutrient Report, it does not consider the technologies discussed in the Report as part of its revision decisions for the Seven Industrial Categories. 2-ER-0450, Preliminary Plan 15 at 5-1; 3-ER-0625, Final Plan 15 at 5-12. EPA ignored the technological evidence provided by both studies when weighing revision for the Seven Industrial Categories.

42

### 3. *EPA Ignored its Own Rulemaking Records for ELGs in Nearly Identical Industrial Categories*

EPA did not consider some of the most relevant information as to whether an industry's limits are still BAT: more recently established ELGs for nearly identical industrial categories. In particular, the centralized waste treatment pollution limits established in 2000 provide such information for petroleum refining and secondary metals. 65 Fed. Reg. 81,300 (Dec. 22, 2000); *see also* 68 Fed. Reg. 71,023 (Dec. 22, 2003) (modifying ELGs); 40 CFR Part 437.

The centralized waste subcategory for oily treatment and recovery applies to facilities receiving and treating petroleum refinery waste, meaning its waste is similar or identical to that of petroleum refineries. 40 CFR § 437.20. The oily treatment and recovery subcategory includes BAT limits for numerous pollutants that are not included in the petroleum refining ELGs, including arsenic, cadmium, cobalt, copper, lead, mercury, tin, zinc, carbazole, n-decane, fluoranthene, and n-octadecane. 40 CFR § 437.23; *see also* 40 CFR Part 419 (refinery limits); 2-ER-0552–0560, *EIP Petroleum Refinery Comments* at 11–19 (discussing unregulated pollutants).

Similarly, the facilities regulated under Part A of the centralized waste treatment ELGs for metals treatment and recovery are frequently also covered by the nonferrous metals manufacturing category's secondary metals subcategories.

43

*See* 65 Fed. Reg. at 81,263 (explaining overlap); 40 CFR § 437.1(d) (excluding facilities regulated under the secondary metals ELGs from the centralized waste treatment ELGs). Again, the centralized waste treatment ELGs limit many pollutants that are not controlled by the older secondary metals ELGs, including (for many subcategories) antimony, arsenic, cadmium, chromium, cobalt, mercury, silver, tin, titanium, and vanadium. *Compare* 40 CFR Part 421, Subparts B, C, F, M, P, Q R, T, V, X, Z, AA, AB, AC and AD *with* 40 CFR Part 437. In Plan 15, EPA did not consider this information, which is directly relevant to whether changes to the refinery and nonferrous metals manufacturing ELGs are needed.

### 4. *EPA Continued to Allow Existing ELGs to Set BAT at BPT*

EPA also ignored a clear sign in its own regulations that certain ELGs no longer represent BAT: BAT limits set at the Best Practicable Technology ("BPT") level, a far less stringent interim standard that expired more than thirty years ago. The petroleum refinery, fertilizer manufacturing, and inorganic chemical categories all include BAT limits that are identical to the BPT limits. *See, e.g.,* 40 CFR §§ 419.12, 419.13, 418.12, 418.13, 415.62, 415.63.

Congress did not intend BPT and BAT limits to be the same. *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 74 (1980). "[T]he difference between BAT and BPT is critical to the Act's 'technology-forcing' scheme." *Sw. Elec. Power Co.*,

44

920 F.3d at 1025. BPT limits were intended as a short-term "first step" in technology controls in the early years of the CWA. *Nat'l Crushed Stone*, 449 U.S. at 75 n.14; *see also Sw. Elec. Power Co*, 920 F.3d at 1006; *BP Explor. & Oil, Inc. v. EPA*, 66 F.3d 784, 789 (6th Cir. 1995) (same). Congress directed that BPT limits be replaced by the more stringent BAT limits by 1989. 33 USC § 1311(b)(2)(E); *Texas Oil & Gas Ass'n v. EPA.,* 161 F.3d 923, 927 (5th Cir. 1998); *Chem. Mfrs. Ass'n*, 870 F.2d at 196.

The two standards have different technology requirements. BPT limits are intended to reflect an average of the best existing performance within an industry, while BAT technologies are to rely on the optimally operating plant, even if it is used in unrelated industries. *Kennecott*, 780 F.2d at 448; *Sw. Elec. Power Co.*, 920 F.3d at 1006, 1031–32; *see also* 2-ER-0547, *EIP Petroleum Refinery Comments* at 6 (summarizing BAT requirements). BAT limits require "a commitment of the maximum resources economically possible to the ultimate goal of eliminating all polluting discharges." *Nat'l Crushed Stone*, 449 U.S. at 74.

Congress also directed EPA to weigh costs differently for BPT and BAT. The central factor for BPT limits is a cost/benefit analysis. 33 USC § 1314(b)(1)(B). By contrast, while establishing BAT limits, EPA is to consider cost as just one factor among many. *Id.* § 1314(b)(2)(B). "[T]he BAT factors omit a

45

cost/benefit analysis and replace it with a requirement to consider only 'the cost of achieving such effluent reduction.'" *Sw. Elec. Power Co.*, 920 F.3d at 1007; *see also Nat'l Crushed Stone*, 449 U.S. at 71–74.

Despite Congress's clear intent that BPT be phased out by 1989 and replaced with BAT, many BAT limits remain identical to BPT limits, including ammonia and sulfide limits for petroleum refineries and phosphorous and fluoride limits for fertilizer manufacturing (phosphate subcategory). 40 CFR §§ 418.12, 418.13, 419.12, 419.13; *see also* 2-ER-0553–0560, *EIP Petroleum Refinery Comments* at 12–19 (discussing ammonia limits). All of the BAT limits within eight inorganic chemical manufacturing subcategories are set at BPT. *See, e.g.,* 40 CFR §§ 415.62, 415.63.

These practices have likely never been legally sound. *See Nat'l Crushed Stone*, 449 U.S. at 74 (describing differences between BPT and BAT). Any doubt, however, was erased in 2019, when the Fifth Circuit overturned EPA's decision to "peg[] BAT for leachate to the decades-old BPT standard, without offering any explanation for why that prior standard is now BAT." *Sw. Elec. Power Co.*, 920 F.3d at 1025. Setting this BAT pollution limit at BPT "[s]trongly suggests that EPA has contravened the plain language of the CWA." *Id.* at 1016. The circuit court held that "although EPA has not been "precluded . . . from *ever* setting BAT

46

equivalent to a prior BPT standard," EPA cannot "simply default[] to the prior

BPT" without an explanation that "speaks to the statutory differences between

BAT and BPT." *Id.* at 1026 (emphasis in original).

### C. EPA Failed to Consider Evidence that the Existing ELGs Do Not Address All Pollutants

The Plan 15 record is filled with information that the Seven Industrial

Categories lack BAT limits for many known pollutants, as well as limits for

stormwater discharges. First, all Seven Industrial Categories lack limits for

phosphorus or total nitrogen or both, despite being present in discharges. *Infra*, p.

49. Second, the ELGs for the petroleum refining, OCPSF, fertilizer manufacturing,

and plastics molding and forming lack limits for a host of known pollutants. *Infra,*

p. 53. Third, four of the Seven Industrial Categories lack any ELGs at all for the

pollutants in industrial stormwater. *Infra,* p. 58.

EPA chose to ignore this information in Plan 15, relying instead on

inappropriate cross-category pollution comparisons to reject revisions to six of the

Seven Industrial Categories. 2-ER-0451 Preliminary Plan 15 at 5-2; 3-ER-0625,

Final Plan 15 at 5-12. Nor did EPA consider this information in the additional

review conducted for plastics molding and forming. 3-ER-0706–0708, *Plan 15*

*Preliminary Review* at 22–39.

47

EPA's failure to consider information that the Seven Industrial Categories' ELGs do not control all nonconventional and toxic pollutants is arbitrary and capricious. This pollution information is directly relevant to the CWA mandate that EPA establish ELGs for known pollutants, and EPA must, at the very least, consider these mandates when making revision decisions. *Our Children's Earth*, 527 F.3d at 851; *supra*, p. 9–14. EPA's obligation here is analogous to EPA's obligation under nearly identical Clean Air Act "review and revise" provisions where courts have found "that EPA, when it undertakes its eight-year review, revise emission standards 'as necessary' … must conform them to the basic requisites of 'emission standards' under section 112, including by setting controls on previously unaddressed hazardous air pollutants." *LEAN*, 955 F.3d at 1088. By failing to consider this information, EPA failed to base its decision on the relevant factors and to consider an important part of the problem. *State Farm,* 463 U.S. at 43; *Center v. USFWS*, 67 F.4th at 1039.

In addition, EPA may not, as it did here, ignore record information that casts doubt on the validity of EPA's previous decisions about the Seven Industrial Categories' ELGs, including its prior decisions to exclude nutrients, toxics, and stormwater discharges. *Env't Health Trust*, 9 F.4th at 903 (finding that agency must address this kind of information in detail and not with "mere conclusory

48

statements"). Similarly, this Court has held that "the Agency will be required to justify its [ELGs] in terms of the more extensive data developed since the regulations were first promulgated," as part of its review and revise obligations. *Ass'n of Pac. Fisheries*, 615 F.2d at 812. EPA's failure to consider all of this relevant information undermines the record support for EPA's decisions. *City and Cnty. of San Francisco*, 75 F.4th at 1095.

**1.** ***EPA Failed to Consider its Own Findings that the ELGs for the Seven Industrial Categories Do Not Address Nutrient Pollution***

None of the Seven Industrial Categories have ELGs for both total nitrogen and phosphorus. When EPA originally established and revised the Seven Industrial Categories' ELGs in the 1970s and 1980s, EPA did not have the scientific and technical understanding it has now about the harmful impacts of phosphorus and nitrogen pollution, as well as the technologies to clean up this pollution. For example, many of the large models pinpointing the role of phosphorus in Chesapeake Bay degradation were not conducted until the 1990s. 1-ER-0201, EPA-HQ-OW-2018-0618-0511, *Sources, fate, and transport of nitrogen and phosphorus in the Chesapeake Bay watershed* at 5 (2011). Now that EPA *does* have a thorough understanding of nutrients' harmful impacts and the widely available technologies to reduce this pollution, EPA violated the APA by ignoring

49

this information when making its decisions to exclude the Seven Industrial
Categories for revision.

EPA's early ignorance of the severity of nutrient pollution is reflected in
EPA's original decisions for the Seven Industrial Categories. When developing the
petroleum refinery ELGs in 1974, EPA decided in part not to set a phosphorus
limit because EPA assumed phosphorus "may be readily utilized in the aquatic life
cycle," and would not lead to toxicity, not considering or understanding that too
much phosphorus can cause increased growth of algae and decreased levels of
dissolved oxygen. 1-ER-0127, EPA-HQ-OW-2018-0618-0306, EPA, *Development
Document for Effluent Limitations Guidelines and New Source Performance
Standards for the Petroleum Refining Point Source Category,* at 89 (Apr. 1974).
The 1984 plastics molding and forming development document includes samples
for phosphorus as high as 123 mg/L, but EPA did not even include phosphorus
when discussing pollutants considered for regulation. 5-ER-1170 and 5-ER-1185,
EPA-HQ-OW-2021-0547-0506, *Plastics Molding and Forming Development
Document* at 146, 161 (Dec. 1984). When establishing and revising ELGs for
inorganic chemicals, OCPSF, nonferrous metal manufacturing, and pesticide
chemicals, EPA did not mention phosphorus or nitrogen at all. *See, e.g.,* 47 Fed.
Reg. 28,260 (June 29, 1982) (inorganic chemicals); 52 Fed. Reg. 42,522 (Nov. 5,

50

1987) (OCPSF); 49 Fed. Reg. 8,742 (Mar. 8, 1984) (nonferrous metal manufacturing); 50 Fed. Reg. 40,672 (Oct. 4, 1985) (pesticide chemicals). EPA did establish phosphorus limits in some fertilizer manufacturing subcategories and included a discussion of nitrogen in the rulemaking. 39 Fed. Reg. 12,832, 12,833 (Apr. 8, 1974). However, the Agency did not consider setting a total nitrogen limit, rather than ammonia nitrogen limits which do not necessarily limit nutrient pollution overall. *Id.*; 2-ER-0549, *Earthjustice/EIP Fertilizer Comments*; at 8 (describing ammonia treatment technology that generated nitrates as a byproduct). Due to these old decisions, the Seven Industrial Categories still lack comprehensive nutrient ELGs. 40 CFR Parts 414, 415, 418, 419, 421, 455, 463.

EPA now knows that its old assumptions about nutrients are incorrect, that nutrient pollution cannot be ignored, and there are available technologies to reduce this pollution. In the 2020 Nutrient Report, EPA states that nutrient pollution "is one of the most widespread, costly, and challenging environmental problems impacting water quality in the United States." 2-ER-0355, *Nutrient Report* at 1-1. The Report also identifies the Seven Industrial Categories as significant sources of nutrients. *Id.* In fact, the Report prioritized further review of plastics molding and forming because of high phosphorus loads and fertilizer manufacturing because of high nitrogen concentrations. 2-ER-0369, *Nutrient Report* at Table 3-2; *see also* 2-

51

ER-0559, *Earthjustice/EIP Fertilizer Comments*, at 18. The Report also identified

current treatment technologies that could be used to establish BAT nutrient ELGs

for the Seven Industrial Categories. 2-ER-0367, *Nutrient Report* at 3-1; *supra,* p.

41.

The Nutrient Report thus presented EPA with new information that the

Seven Industrial Categories are significant sources of nutrient pollution and

technology is widely available to dramatically reduce this pollution. 2-ER-0369,

*Nutrient Report* at 3-1, Table 3-2. But EPA did not include the Nutrient Report's

information and recommendations in its revision decisions for the Seven Industrial

Categories. Instead, EPA brushed aside the Nutrient Report in favor of using the

Concentration Ranking to exclude six of these categories, making a vague

statement that "EPA uses its annual analyses and technical expertise to prioritize

its reviews and to focus on point source categories that are best suited for revisions

that further the objectives of the CWA." 2-ER-0450, Preliminary Plan 15 at 5-1;

*see also* 2-ER-0531, *Earthjustice/EIP Fertilizer Comments* at 18 (discussing

contradictions between the Concentration Ranking and Nutrient Report). When

EPA decided to exclude plastics molding and forming from revision, the Agency

did not even mention the Nutrient Report's earlier finding that the category had

some of the highest phosphorus pollution concentrations of all industrial

52

categories. 3-ER-0707–0724, *Plan 15 Preliminary Review* at 22–39; 3-ER-0623, Final Plan 15 at 5-10.

The 2020 Nutrient Report is "evidence that its current regulations are inadequate or the factual premises underlying its prior judgment have eroded." *Env't Health Trust*, 9 F.4th at 903; *cf. O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 943–44 (9th Cir. 1996) (not remanding the agency decision because "there has been no intervening study demonstrating the inaccuracy of a factual presumption underlying the glazing standard or the necessity of regulation"). EPA is thus required to seriously consider the Report as part of its decision making process. *Env't. Health Trust*, 9 F.4th at 903. The Agency's failure to do so is arbitrary and capricious.

### 2. *EPA Ignored Record Information that the ELGs for at Least Four of the Industrial Categories Do Not Address Other Known Pollutants*

The record contains ample evidence that the ELGs for the petroleum refining, OCPSF, fertilizer manufacturing, and plastics molding and forming categories do not limit other known pollutants besides nutrients.

In a 2019 study on the petroleum refining category, EPA itself identified numerous pollutants discharged by refineries that lacked ELGs, including arsenic, BTEX (benzene, toluene, ethylbenzene, xylenes), cadmium, copper, cyanide, lead, mercury, nickel, selenium, total dissolved solids, uranium-238, and zinc. 1-ER-

53

0162–0163, *EPA Refinery Study* at 5-1, 5-2; *see also* 2-ER-0524–0532, *EIP Petroleum Refinery Comments* at 11–19 (discussing unregulated pollutants). In addition, EPA has identified at least one refinery that discharged measurable amounts of PFAS. 1-ER-0259, EPA-HQ-OW-2018-0618-0531, *EPA's Review of Per- and Polyfluoroalkyl Substances (PFAS) in Industrial Wastewater Discharge* at 5-2.

The Center's 2019 petition identified OCPSF pollutants without ELGs, like plastic particles (nurdles), dioxins, phthalates, and polycyclic aromatic hydrocarbons (PAHs). 5-ER-1044, *Center Plastics Petition* at 19.

Several groups provided evidence that fertilizer manufacturing plants discharge lead, mercury, cadmium, and arsenic, but have no ELGs for these pollutants. 2-ER-0550 and 2-ER-0555, *Earthjustice/EIP Fertilizer Comments* at 9, 14.

EPA specifically reserved setting ELGs for three of the plastics molding and forming industry's toxic pollutants (bis(2–ethylhexyl) phthalate, di-n-butyl phthalate, and dimethyl phthalate) pending a study in 1984. 49 Fed. Reg. 49,026, 49,027 (Dec. 17, 1984). In the decades since, however, EPA has never set limits based on any completed study. 40 CFR § 463.37.

54

EPA did not consider any of this information when deciding not to revise these four categories' ELGs. EPA excluded petroleum refineries, OCPSF facilities, and fertilizer plants from revision based only on EPA's screening level reviews, which did not consider whether the existing ELGs limited known pollutants. 2-ER-0450–0455, Preliminary Plan 15 at 5-1 to 5-6. EPA did not address comments regarding the failure of existing fertilizer manufacturing and petroleum refining ELGs to limit known pollutants or the Center's information regarding OCPSF pollution. 4-ER-1013, *Response to Comments* at 270; 2-ER-0451, Preliminary Plan 15 at 5-2.

Nor did EPA consider this information when it conducted a longer review of plastics molding and forming in Final Plan 15. 3-ER-0622, Final Plan 15 at 5-9. There EPA noted that limits were reserved for the three toxics "to indicate that [EPA] may develop ELGs at a later date," but did not provide any explanation as to why EPA was continuing to defer establishing ELGs in light of its mandate to control this pollution. *Id.*; *supra*, p. 9 (mandate to establish ELGs). Instead, EPA rejected revision of the category because "revisions to the ELG are unlikely to result in significant pollutant discharge reductions relative to the other point source categories discussed in this Plan." 3-ER-0624, Final Plan 15 at 5-11. This is arbitrary and capricious. *See Waterkeeper All. v. EPA*, 399 F.3d 486, 522–523 (2d

55

Cir. 2005) (finding EPA's decision not to set certain effluent limits arbitrary and capricious "since there [was] . . . evidence in the record suggesting" that the limits were necessary and EPA had not "attempted, in any way, to explain" its decision).

EPA may not discharge its obligation to consider whether these categories are missing ELGs for known toxic pollutants by hiding behind its old, 1970s and 1980s-era decisions. In particular, EPA excluded many toxic pollutants at that time under a 1976 consent decree.[11] In this consent decree, EPA agreed to establish ELGs under a strict timetable on the condition that the Agency could exclude toxics from regulation based on certain criteria. 1-ER-0086, EPA-HQ-OW-2018-0618-0304 EPA, *Final Development Document for Effluent Limitation Guidelines and Standards for the Petroleum Refining Point Source Category* at 142 (Oct. 1982) ("*1982 Refineries Development Document*"); Consent Decree, *NRDC et al. v. Train,* 6 ELR 20588 ¶¶ 4(a), 5, 8(a) (D.D.C. June 9, 1976). These criteria included if the pollutant is "already effectively controlled by technologies upon

---

[11] The consent decree settlement claims relating to an earlier version of the CWA, prior to the addition of the Section 307(a)(2) requirement. *See Env't Def. Fund, Inc. v. Costle*, 636 F.2d 1229, 1234 (D.C. Cir. 1980) (describing history and legal effect of Consent Decree). Note that Petitioners do not agree that EPA can alter its CWA obligations to set BAT limits for all nonconventional and toxic pollutants through a consent decree.

which other effluent limitations and guidelines are based." Consent Decree ¶

8(a)(iii); 1-ER-0086, *1982 Refineries Development Document* at 142.

EPA aggressively relied on these Consent Decree criteria to exclude toxics

from the petroleum refinery, plastics molding and forming, and OCPSF ELGs. *See.*

*e.g.,* 1-ER-0086 *1982 Refineries Development Document* at 142; 49 Fed. Reg. at

49,039; 52 Fed. Reg. at 42,529. Yet none of these criteria are in the CWA itself.

*See, e.g.,* 33 USC § 1317(a)(2) (requirement to establish ELGs for toxics). In

addition, the record contains considerable evidence undermining the factual bases

for these decade-old exclusions. For instance, EPA's decisions not to set refinery

ELGs for arsenic, benzene, cadmium, copper, cyanide, mercury, nickel, and

selenium because these pollutants are already "effectively controlled," are

undermined by EPA records showing them to still be present in refinery

wastewater, as well as the far stricter water quality standards established in the

years since that change the meaning of "effectively control." *See, e.g., EPA*

*Refinery Study* at Table 5-1 (showing arsenic, benzene, cadmium, copper, cyanide,

mercury, nickel, and selenium to still be present in refinery wastewater, sometimes

in large quantities); 5 CCR 1002-31, Table III (Colorado water quality standards

for metals). In Plan 15, EPA did not consider how this new information

undermined its previous decisions not to establish ELGs for these toxics.

EPA's decisions to ignore information about these four categories' known pollutants are arbitrary and capricious because EPA did not consider the CWA's mandates to establish ELGs for all pollutants, thus failing to base its decisions on relevant factors, and failed to consider new information showing that "the factual premises underlying its prior judgment have eroded." *Env't Health Trust*, 9 F.4th at 903; *see also State Farm*, 463 U.S. at 43.

### 3. EPA Ignored Information that the Existing ELGs Do Not Control Pollutants in Industrial Stormwater

The record contains ample information that EPA should have considered that the existing ELGs do not control pollutants in stormwater discharges for the Seven Industrial Categories. First, four categories—OCPSF, nonferrous metal manufacturing, inorganic chemical manufacturing, and plastics molding and forming—have no ELGs to limit pollutants in stormwater discharges at all. 40 CFR Parts 414, 415, 421, 463. The CWA does not allow EPA to entirely exempt a class of point sources, like industrial stormwater, from regulation without explanation. 33 USC § 1311(b)(2)(A); *Supra* at p. 12. In fact, the record includes a petition from the Center reminding EPA of its legal duty to establish stormwater ELGs and urging EPA to promulgate stormwater ELGs for the OCPSF and plastics molding and forming categories. 5-ER-1035, *Center Plastics Petition* at 5. At the very least, EPA should have considered whether it was appropriate to revise these four

58

categories' ELGs because of their lack of stormwater limits. 33 USC §

1311(b)(2)(A); *State Farm,* 463 U.S. at 43.

Second, EPA failed to consider a change in the law expanding the scope of

industrial stormwater regulation since EPA initially promulgated ELGs for the

OCPSF, nonferrous metal manufacturing, inorganic chemical manufacturing,

plastics molding and forming, petroleum refining, and fertilizer manufacturing

categories. Specifically, Congress amended the CWA in 1987 to make EPA's duty

to regulate industrial stormwater as a point source more explicit, and EPA

established regulations in 1990 broadening the scope of industrial stormwater point

sources to runoff "directly related to manufacturing, processing or raw materials

storage areas at an industrial plant." 33 USC § 1342(p)(2)(B); 40 CFR §

122.26(b)(14).

None of the ELGs for these six industrial categories reflect the changes

brought about by the 1990 regulations. When establishing ELGs for nonferrous

metals manufacturing in 1974, EPA did not include limits for stormwater because

EPA assumed that it was only necessary to control pollution from stormwater that

"comes into direct contact with any raw material, intermediate by-product, or

product used in or resulting from" the industrial activity, which is a much narrower

definition of industrial stormwater than the 1990 regulations. 39 Fed. Reg. 12,822,

59

12,823 (Apr. 8, 1974); 40 CFR § 122.26(b)(14) (1990 regulations). When establishing ELGs for inorganic chemical manufacturing in 1982, EPA did not include limits for non-process water, assuming that the most appropriate way to regulate stormwater was through management practices rather than numeric limits. 47 Fed. Reg. 28,260, 28,273 (June 29, 1982). When considering limits for plastics molding and forming in 1984, EPA did not even mention stormwater. 5-ER-1099, *Plastics Molding and Forming Development Document* (Dec. 1984). When finalizing a 1983 proposed ELG rule for OCPSF in 1987, EPA excluded "general site surface runoff," from any limits. 52 Fed. Reg. at 42,566; *see also* 48 Fed. Reg. 11,828 (Mar. 21, 1983). None of these four categories have since been updated to include stormwater ELGs. 40 CFR Parts 414, 415, 421, 463.

While EPA did set ELGs to control pollution in stormwater from fertilizer manufacturing and petroleum refineries before 1987, the Agency only established limits for a subset of what now constitutes industrial stormwater point sources under 40 CFR § 122.26(b)(14). The fertilizer manufacturing stormwater ELGs only apply to "precipitation runoff which, during manufacturing or processing, comes into **incidental contact** with any raw material, intermediate product, finished product, by-product or waste product." 40 CFR § 418.11(c) (emphasis added); 41 Fed. Reg. 20,582, 20,583 (May 19, 1976). The 1985 petroleum refinery

60

stormwater ELGs similarly only apply to "runoff which comes into **contact** with any raw material, intermediate product, finished product, by-product or waste product located on petroleum refinery property." 40 CFR § 419.11(g) (emphasis added); 50 Fed. Reg. 28,516, 28,519 (July 12, 1985). This means that a portion of industrial stormwater discharged by refineries is not subject to any ELGs. *See, e.g.,* 1-ER-0022, EPA-HQ-OW-2018-0618-0230, DE0000256 Delaware City Refinery Fact Sheet at 21; 6-ER-1403, Permit LA0006041 at 7; 7-ER-1448 and 7-ER-1463, Permit CA0005550 at 2, 17 (stormwater outfalls at refineries without ELGs).

The 1987 CWA Amendments and 1990 regulations call into question the legal validity of EPA's current ELGs for six of the Seven Industrial Categories with respect to stormwater discharges. 33 USC § 1342(p)(2)(B); 40 CFR § 122.26(b)(14). As such, EPA was required to carefully consider this change in law before reaching a revision decision. *State Farm*, 463 U.S. at 43; *Env't Health Trust*, 9 F.4th at 903; *see also Ass'n of Pac. Fisheries*, 615 F.2d at 812.

EPA did not explain why it decided to maintain the status quo even where a change in law undermined EPA's previous assumptions about the scope of stormwater regulation. Instead, EPA took pains in Plan 15 to specifically avoid consideration of stormwater. EPA omitted all stormwater data from the Concentration Ranking, which EPA relied on to exclude all but the plastics

61

molding and forming category for revision. *Supra,* p. 37. EPA also excluded

stormwater discharges from consideration in its preliminary review of the plastics

molding and forming category because the discharges were not covered by the

current ELGs. 3-ER-0708, *Plan 15 Preliminary Review* at 23. Ironically, EPA

never considered whether the lack of legally required stormwater ELGs would be a

reason to revise the ELGs. *Id.* Nor did EPA consider whether the lack of

stormwater ELGs could affect EPA's conclusion that revisions to plastics molding

and forming limits "are unlikely to result in significant pollutant discharge

reductions relative to the other point source categories discussed in this Plan." 3-

ER-0624, Final Plan 15 at 5-11.

### D. EPA Did Not Consider the Feasibility of Zero Discharge Limitations for the Seven Industrial Categories

When developing ELGs, EPA must "identify control measures and practices

available to eliminate the discharge of pollutants from categories and classes of

point sources, taking into account the cost of achieving such elimination of the

discharge of pollutants." 33 USC § 1314(b)(3). In fact, Congress intended to

"push[] industries toward the goal of zero discharge as quickly as possible"

through ELGs to meet the CWA's goal of eliminating water pollution. *Kennecott*,

780 F.2d at 448.

62

Plan 15, however, included no analyses or mention of whether the discharges from any of these Seven Industrial Categories could be eliminated. The screening level reviews EPA relied on to exclude six of the Seven Industrial Categories from revision did not consider whether a category can achieve no discharge. 2-ER-0450, Preliminary Plan 15 at 5-1. Nor did EPA evaluate zero discharge limitations in its additional review of the plastics molding and forming category. 3-ER-0706–0708, *Plan 15 Preliminary Review* at 21–23; 3-ER-0623, Final Plan 15 at 5-10.

EPA's failure to consider the CWA's no-discharge provisions is arbitrary and capricious because EPA ignored a key CWA mandate for ELGs, meaning EPA did not base its decision upon relevant factors and did not consider an important part of the problem. *Center v. USFWS*, 67 F.4th at 1039; *State Farm,* 463 U.S. at 43.

### E. EPA Did Not Supply a Reasoned Basis for its Decisions to Not Revise the ELGs for the Seven Industrial Categories

Not only are EPA's decisions arbitrary and capricious for the reasons described above, these decisions lack any reasoned basis. An "agency must fully explicate its course of inquiry, its analysis, and its reasoning." *Tanner's Council of America v. Train*, 540 F.2d 1188, 1191 (4th Cir. 1976). "Without an adequate explanation," this Court is "precluded from undertaking meaningful judicial

63

review." *Humane Soc.*, 626 F.3d at 1049 (remanding the decision). Due to the national importance and public health import of the Seven Industrial Categories' large-scale pollution, EPA "has the heaviest of obligations to explain and expose every step of its reasoning." *Am. Lung Ass'n*, 134 F.3d at 392.

This explanation must be in the record. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1907 (2020) (citing *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

Here, EPA based its decisions to exclude six of the Seven Industrial Categories on irrelevant factors flatly rejected by the Fifth Circuit. *Supra*, p. 27; *Sw. Elec. Power Co.*, 920 F.3d at 1026. EPA offered no additional basis for its decisions. In addition, EPA failed to explain why it ignored record evidence directly relevant to the CWA mandates EPA must consider, including evidence undermining the basis of EPA's previous decisions for the Seven Industrial Categories. *Supra*, p. 48. EPA also failed to respond substantively to comments

64

raising these problems.[12] Thus, EPA failed to explicate its decisions, and as a result, that decision is unlawful.

## II.   EPA's Decisions Not to Revise the Pretreatment Standards for the Seven Industrial Categories are Arbitrary and Capricious

EPA's decisions not to revise the pretreatment standards for the Seven Industrial Categories are arbitrary and capricious for the reasons discussed above and because EPA failed to provide any explanation at all for these decisions. 3-ER-0598 Final Plan 15 at 1-1. Like ELGs, pretreatment standards are to be reviewed on an annual basis. 33 USC § 1314(g)(1). However, the CWA mandates for establishing and revising pretreatment standards are not identical to those for ELGs. EPA is also to revise pretreatment standards "from time to time, as control technology, processes, operating methods, or other alternatives change." 33 USC § 1317(b)(2). And EPA is to establish pretreatment standards when pollutants from indirect industrial dischargers interfere with or cannot be treated by POTWs. 33 USC §§ 1317(b)(1), 1317(c), 1314(g)(1). The number of facilities regulated by

---

[12] To the extent EPA based its decisions not to revise the Seven Industrial Categories' ELGs on a lack of resources, without consideration of the CWA's mandates, such a decision would be unlawful. "[P]rioritizing pressing matters does not mean agencies have license to ignore the law." *Ctr. for Food Safety*, 56 F.4th at 658.

ELGs and pretreatment standards can also be quite different—several categories, including plastics molding and forming, have far more indirect dischargers than direct dischargers. 3-ER-0707, *Plan 15 Preliminary Review* at 22; 3-ER-0628, Final Plan 15 at 6-1.

EPA did not articulate any basis for its decisions not to revise the pretreatment standards and did not respond to comments asking EPA to establish pretreatment standards for fertilizer manufacturers. 2-ER-0436–0476, Preliminary Plan 15; 3-ER-0592–0658, Final Plan 15; 2-ER-0546, *Earthjustice/EIP Fertilizer Comments* at 5; 4-ER-1013, *Response to Comments* at 270. EPA never addressed whether "control technology, processes, operating methods, or other alternatives" had changed for the Seven Industrial Categories' pretreatment standards. 2-ER-0436–0476, Preliminary Plan 15; 3-ER-0592–0658, Final Plan 15. EPA never discussed what pollutants are likely to interfere with or cannot be treated by POTWs. 2-ER-0436–0476, Preliminary Plan 15; 3-ER-0592–0658, Final Plan 15. EPA did not explain why relying on the Concentration Ranking or Loading Analysis—based on direct dischargers' DMRs—was a rational basis for making revisions decisions about pretreatment standards. 2-ER-0436–0476, Preliminary Plan 15; 3-ER-0592–0658, Final Plan 15. In fact, EPA did not even state its pretreatment decisions directly—but expressed them only through implication. *See,*

66

*e.g.*, 3-ER-0613, Final Plan 15 at 4-2 ("Categories not discussed in detail in Plan 15 are not priorities for further study or rulemaking at this time").

"[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec.*, 140 S. Ct. at 1907. Because EPA failed to articulate any grounds for its decision not to publish pretreatment standards, its decision is arbitrary and capricious. *Humane Soc.*, 626 F.3d at 1049.

## CONCLUSION

For the reasons set forth above, Waterkeeper respectfully requests the Court grant Waterkeeper's petition for judicial review.

Respectfully submitted on September 13, 2023.

s:/ Meg Parish
Jennifer Duggan, Deputy Director
Meg Parish, Senior Attorney
Sarah Kula, Staff Attorney
Environmental Integrity Project
1000 Vermont Ave NW, Suite 1100
Washington, DC 20005
(202) 263-4446
jduggan@environmentalintegrity.org
mparish@environmentalintegrity.org
skula@environmentalintegrity.org
*Counsel for Waterkeeper Alliance,
Center for Biological Diversity, Clean
Water Action, Food & Water Watch,
Healthy Gulf, Environment America,
Surfrider Foundation, Bayou City
Waterkeeper, Black Warrior
Riverkeeper, San Antonio Bay Estuarine
Waterkeeper, Tennessee Riverkeeper,
and San Francisco Baykeeper*

s:/ Hannah Connor
Hannah Connor
Environmental Health Deputy Director
and Senior Attorney
Center for Biological Diversity
(202) 681-1676
HConnor@biologicaldiversity.org
*Counsel for Center for Biological
Diversity*

68

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th of September, I electronically filed the foregoing

PETITIONERS' OPENING BRIEF with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to counsel of record.


s:/ Meg Parish
Meg Parish, Senior Attorney
Environmental Integrity Project
1000 Vermont Ave NW, Suite 1100
Washington, DC 20005
(202) 263-4446
mparish@environmentalintegrity.org

69

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

**Form 8.** Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>No. 23-636</u>

I am the attorney or self-represented party.

**This brief contains** <u>13,982</u> **words,** including <u>71</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____s/Meg Parish_____     **Date** ___**9/13/2023**_____

70