No. 23-636

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WATERKEEPER ALLIANCE, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.
*Respondents*.

Petition for Review of Actions of the U.S. Environmental Protection Agency, and
MICHAEL S. REGAN, in his official capacity as Administrator of the U.S.
Environmental Protection Agency

**BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

Of Counsel:

KRISTA HUGHES
*Attorney*
U.S. Environmental Protection Agency

TODD KIM
*Assistant Attorney General*
GUS MAXWELL
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
999 18th Street; South Terrace, Suite 370
Denver, CO 80202
(202) 598-3307
gustavus.maxwell@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ..........................................................................1

STATEMENT OF JURISDICTION.....................................................2

STATEMENT OF THE ISSUES.........................................................3

STATEMENT OF THE CASE............................................................4

    A.    Statutory and regulatory background ...................................4

        1.    The Clean Water Act.................................................4

        2.    Periodic review and planning.....................................6

    B.    Factual background ..........................................................7

        1.    EPA's annual review of all existing ELGs .....................8

            a.    The Category Rankings Analysis .....................11

            b.    Preliminary Category Reviews........................13

            c.    Detailed Studies.........................................14

            d.    Rule Revisions...........................................15

            e.    Industrial Wastewater Treatment
                  Technology Reviews and Database.................17

            f.    Environmental Justice...................................17

        2.    Preliminary Plan 15.................................................18

        3.    Program Plan 15.....................................................19

SUMMARY OF ARGUMENT ............................................................21

STANDARD OF REVIEW ...................................................22

ARGUMENT ...................................................................23

I.    This Court lacks jurisdiction to hear this case because Program Plan 15 is not a final agency action. ...............................23

    A.    Program Plan 15 is not an "agency action" under the Administrative Procedure Act. .....................................24

    B.    Program Plan 15 is not a final agency action. .....................25

    C.    EPA's periodic revision determinations within ELG plans are themselves not final actions. ..................................29

    D.    Petitioners failed to preserve their claims for four of the seven source categories at issue, and are therefore barred from raising them before the Court. .....................................35

II.    EPA has broad discretion over the content of its annual review process. ..................................................................36

    A.    The Clean Water Act gives EPA discretion in structuring ELG reviews. ..........................................................37

    B.    Petitioners erroneously read review requirements into the Clean Water Act that Congress did not create. ...................39

        1.    There are no "mandatory factors" in EPA's annual review of all 59 source categories. ...........................39

        2.    Zero-discharge limits, control-levels adjustments, and unregulated pollutants and wastestreams are required considerations for the *revision* of ELGs, but not in their *review*. ...........................................43

III.    EPA's annual review process is thorough, reasonable, and consistent with the Clean Water Act. ...............................48

A.  EPA's annual ELG review is a practical and iterative process that extends far beyond the Category Rankings Analysis. ..............................................................48

B.  EPA adequately explained its reasoning and was not required to say more about those categories that it will consider again in future years...............................................50

C.  EPA reasonably relied on DMR data at the initial stage of its annual review.................................................................53

D.  Petitioners' claims that EPA ignored advances in technology and its own relevant studies misunderstand the nature of EPA's annual review process.........................56

IV.  Petitioners may not substitute their priorities for those of the Agency. ..................................................................................59

CONCLUSION ......................................................................................62

STATEMENT OF RELATED CASES ...................**Error! Bookmark not defined.**

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

Cases                                                                          Page(s)

*Advocs. for Highway & Auto Safety v. Fed.Motor Carrier Safety Admin.*,
    429 F.3d 1136 (D.C. Cir. 2005) ............................................................36

*Am. Mining Cong. v. EPA*,
    965 F.2d 759 (9th Cir. 1992) ....................................................... 22, 24

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) ................................................................................60

*Barnes v. U.S. Dep't of Transp.*,
    655 F.3d 1124 (9th Cir. 2011) ............................................................23

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..................................................................... passim

*Bethlehem Steel Corp. v. EPA*,
    782 F.2d 645 (7th Cir. 1986) ..............................................................27

*City of San Diego v. Whitman*,
    242 F.3d 1097 (9th Cir. 2001) ............................................................24

*Ctr. for Biological Diversity v. Haaland*,
    58 F.4th 412 (9th Cir. 2023) ....................................................... passim

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ............................................................................36

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ............................................................................47

*Env't Def. Fund v. Thomas*,
    870 F.2d 892 (2d Cir. 1989) ........................................................ 33, 34

*Exxon Mobil Corp. v. EPA*,
    217 F.3d 1246 (9th Cir. 2000) ............................................................36

*In re Barr Lab'ys*,
    930 F.2d 72 (D.C. Cir. 1991) ...................................................... 60, 61

*Jama v. Immigr. & Customs,*
    *Enf't*, 543 U.S. 335 (2005)................................................................47

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)................................................................59

*Kruso v. Int'l Tel. & Tel. Corp.*,
    872 F.2d 1416 (9th Cir. 1989) ................................................22

*La. Env't Action Network v. EPA*,
    955 F.3d 1088 (D.C. Cir. 2020) ...........................................45

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)................................................................61

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)................................................................40

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)................................................ 24, 32, 35

*Maier v. EPA*,
    114 F.3d 1032 (10th Cir. 1997) ..............................................2

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)................................................... 23, 61

*Mich. Dep't of Env't. Quality v. Browner*,
    230 F.3d 181 (6th Cir. 2000) ................................................36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................. 3, 23, 50

*Nat'l Ass'n of Mfrs. v. Dep't of,*
    *Def.*, 583 U.S. 109 (2018)......................................................39

*Nat'l Cong. Of Hisp. Am. Citizens v. Marshall*,
    626 F.2d 882 (D.C. Cir. 1979) .............................................60

*Norton v. S. Utah Wilderness,*
    *All.*, 542 U.S. 55 (2004) ............................................... 24, 29

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) .................................................................25

*Our Children's Earth Found. v. EPA*,
    527 F.3d 842 (9th Cir. 2008) ................................................... passim

*Pont de Nemours & Co. v. Train*,
    430 U.S. 112 (1977) ................................................................. 6, 30

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
    501 F.3d 1009 (9th Cir. 2007) .................................................36

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
    499 F.3d 1108 (9th Cir. 2007) ............................................. 22, 51

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) ...................................................................40

*S. Cal. All. of Publicly Owned Treatment Works v. EPA*,
    8 F.4th 831 (9th Cir. 2021) .....................................................29

*S.F. Herring Ass'n v. Dep't of the Interior*,
    946 F.3d 564 (9th Cir. 2019) ..................................................27

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ............................................. 55, 56

*Southwestern Electric Power Company* (*SWEPCO*) *v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ............................................. 42, 43

Statutes

5 U.S.C. § 551(13) .......................................................................24

5 U.S.C. § 704 .........................................................................24, 27

5 U.S.C. § 706(2)(A) ....................................................................22

16 U.S.C. § 1533(f) .....................................................................28

33 U.S.C. § 1251(a) ...................................................................4, 46

33 U.S.C. § 1311(b) ......................................................................5

33 U.S.C. § 1311(b)(1)(C) ..............................................................5

vi

33 U.S.C. § 1311(b)(2)(A) ............................................................44
33 U.S.C. § 1311(d) ..................................... 2, 6, 30, 38, 40, 45, 60
33 U.S.C. § 1314(b) ......................... 2, 4, 6, 30, 34, 37, 38, 40, 45, 60
33 U.S.C. § 1314(b)(1)(A) ..........................................................16
33 U.S.C. § 1314(b)(2)(A) .......................................................37, 38
33 U.S.C. § 1314(b)(2)(B) .............................................16, 38, 39, 49
33 U.S.C. § 1314(b)(3) ...............................................................44
33 U.S.C. § 1314(g) ............................................................2, 5, 30
33 U.S.C. § 1314(g)(1) .................................7, 34, 38, 40, 45, 60
33 U.S.C. § 1314(m) ..........................................................2, 8, 30
33 U.S.C. § 1314(m)(1)(A) ...........................................................7
33 U.S.C. § 1314(m)(2) ................................................................7
33 U.S.C. § 1316 ........................................................................2
33 U.S.C. § 1316(b)(1)(B) ........................... 5, 6, 34, 38, 40, 45, 60
33 U.S.C. § 1317(a)(2) .................................................................44
33 U.S.C. § 1317(b) ....................................................................2
33 U.S.C. § 1317(b)(1) .................................................................5
33 U.S.C. § 1317(b)(2) ........................... 6, 30, 34, 38, 40, 45, 60
33 U.S.C. § 1317(c) ....................................................................5
33 U.S.C. § 1318 ........................................................................2
33 U.S.C. § 1365(a)(2) ................................................................33
33 U.S.C. § 1369(b)(1) .................................................................2
33 U.S.C. § 1369(b)(1)(E) ...........................................................23
42 U.S.C. § 7409(d)(1) ................................................................34
42 U.S.C. § 7411(b)(1)(B) ...........................................................34

## Regulations

40 C.F.R. Subchapter N ..........................................................8, 48
40 C.F.R. part 423 ....................................................................15

Federal Register

88 Fed. Reg. 6258 (Jan. 31, 2023) ............................................................2

89 Fed. Reg. 4474 (Jan. 23, 2024) ..........................................................16

## INTRODUCTION

The Clean Water Act authorizes the U.S. Environmental Protection Agency to adopt nationally applicable, technology-based limits for pollutants discharged to waters of the United States from industrial facilities and other point sources. As of 2024, these standards applied to some 160,000 individual facilities in 59 distinct categories of point sources. Together they prevent the discharge of hundreds of billion pounds of myriad pollutants every year.

EPA annually reviews its standards for all 59 source categories for potential revision. In this iterative review process, the Agency considers the amount of pollutants each category discharges, available treatment technologies, the economic achievability of those technologies, environmental justice, urgent needs to address particularly harmful contaminants, and other factors. EPA publishes its findings and announces its regulatory priorities in an annual planning document. The Agency's latest such plan is Effluent Guidelines Program Plan 15.

Program Plan 15 is challenged by environmental groups in this petition for review. They generally allege that EPA's prioritization analysis was inconsistent with certain statutory factors, and, more specifically, that EPA was required to revise the discharge standards for seven particular source categories.

Their case fails for two reasons. First, their claims are unreviewable: Petitioners challenge not a final agency action, but an ongoing regulatory planning

1

process that lacks binding effect. Second, even if their claims are reviewable, this Court has already rejected the basic premise of Petitioners' case: that the statutory criteria governing the *substance* of EPA's discharge standards must also dictate their periodic *review*. *See Our Children's Earth Found. v. EPA*, 527 F.3d 842, 851 (9th Cir. 2008). What's more, EPA's planning process was patently reasonable, and its selection of priorities was sound.

The petition should be dismissed for lack of jurisdiction, or alternatively, denied on the merits.

## STATEMENT OF JURISDICTION

This Court lacks jurisdiction because Program Plan 15 is not a "final" agency action under the two-part test set out in *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see infra* at 23–36.

The Agency invoked 33 U.S.C. §§ 1311(d), 1314(b), 1314(g), 1314(m), 1316, 1317(b), and 1318 as authority in publishing Program Plan 15. The document was published on January 31, 2023. 88 Fed. Reg. 6258. The petition for review was timely filed 70 days later, on April 11, 2023. ECF 1. If Program Plan 15 is reviewable, this Court has jurisdiction under 33 U.S.C. § 1369(b)(1); *see Maier v. EPA*, 114 F.3d 1032, 1038–39 (10th Cir. 1997) (reviewing EPA's refusal revise a pollutant discharge standard).

## STATEMENT OF THE ISSUES

1.     Agency action is reviewable only if final—meaning that it must (1) mark the consummation of the agency's decisionmaking process, and (2) determine rights or obligations, or be the source of legal consequences. *Bennett v. Spear*, 520 U.S. at 177–78. Program Plan 15 describes EPA's interlocutory intentions and regulatory priorities at the time it was published, but itself establishes no regulations and contains no commands. Is Program Plan 15 unreviewable for lack of finality?

2.     Agency action may be set aside as arbitrary and capricious if the agency failed to examine the relevant data and articulate a satisfactory explanation for its action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In Plan 15, EPA examined data from 375,000 facilities in 59 source categories and carefully explained its regulatory priorities in a 67-page document. Was EPA's selection of priorities reasonable, even though it did not announce revision of the discharge standards for the seven source categories favored by Petitioners?

## STATEMENT OF THE CASE

**A.      Statutory and regulatory background**

**1.      The Clean Water Act**

The Clean Water Act (CWA) aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Two major prongs of the Act are technology-based pollutant limits and water-quality-based pollutant limits. The two prongs take different approaches to limiting pollutant discharges. Technology-based limits focus on a given category of point sources, such as airports, animal feeding operations, and petroleum refineries. They set pollutant discharge limits based on technology-based controls that individual facilities can adopt to limit the amount of pollutant entering the waters of the United States. EPA's technology-based limits apply to all facilities in the particular source category, no matter where the facility is located.

Water-quality-based limits, which are not at issue here, are driven not by the category of the discharger, but by the pollutants themselves—and how much of a given pollutant can be discharged to a particular waterbody consistent with the uses it is designated to support, such as recreation, fishing, or aquatic life.

Technology-based limits may be either more or less protective than is necessary to safeguard water quality for a given waterbody. When technology-based limits fall short, permit writers must incorporate more stringent limits on

dischargers where necessary to meet water quality standards. 33 U.S.C. § 1311(b)(1)(C). Permitting authorities, typically states, incorporate both types of requirements into discharge permits for individual facilities. These permits are known as "National Pollutant Discharge Elimination System permits" or "NPDES permits."

This case is about EPA's nationwide technology-based limits, which include several components. First, there are limits that apply to facilities that discharge directly to waters of the United States. These are "*effluent limitations*," "*effluent guidelines*," and "*new source performance standards*." *See id.* §§ 1311(b), 1314(b), 1316(b)(1)(B). Second, there are limits for facilities whose discharges reach waters of the United States through publicly-owned treatment works. These are "*pretreatment standards*," "*pretreatment guidelines*," and "*pretreatment standards for new sources*." *See id.* §§ 1317(b)(1), 1314(g); 1317(c). Historically, EPA has combined these components into a single rulemaking and referred to the resulting rules as a "Effluent Limitations, Guidelines, and Standards," or "ELGs" for short.[1] *See* 3-ER-602, Program Plan 15 at 2-3.

---

[1] Petitioners depart from EPA's labeling conventions. They use the term "ELG" to describe only regulations for direct dischargers, but not indirect dischargers. Pet. Br. at 8–9. Where EPA uses the term "ELG" to refer to the complete set of limits for both direct and indirect dischargers in a given source category, Petitioners instead use the term "National Pollution Limits." *Id.* Because EPA's record documents employ the broader use the term "ELG," we have maintained that convention in this brief.

To develop ELGs, EPA identifies the pollutants to be regulated in a particular source category or subcategory of sources, as well as a technology that represents the statutorily prescribed level of control for those pollutants. Where EPA determines that a technology satisfies the statutory criteria, the Agency calculates the discharge limits that can be achieved by that technology and establishes corresponding limits. *See E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 130-31 (1977).

### 2. Periodic review and planning

The Clean Water Act requires EPA to establish and periodically review ELGs. As to direct dischargers, the Act sets out EPA's duties to:

- "[R]eview[] at least every five years and, if appropriate, revise[]" *effluent limitations*, 33 U.S.C. § 1311(d);

- At "least annually . . . revise, if appropriate, [*guidelines for effluent limitations*]," *id.* § 1314(b); and

- "[F]rom time to time, as technology and alternatives change, revise [*new source performance*] *standards,*" *id.* § 1316(b)(1)(B) (italics added).

As to indirect dischargers, the Act requires EPA to:

- "[F]rom time to time, as control technology, processes, operating methods, or other alternatives change, revise [*pretreatment*] *standards.*" *id.* § 1317(b)(2) (italics added); and

6

- "[R]eview at least annually . . . and, if appropriate, revise *guidelines for pretreatment*," *id.* § 1314(g)(1) (italics added).

Although the provisions above call for varying review intervals, as a matter of practice EPA conducts all of these reviews simultaneously each year. *See* 3-ER-602, Program Plan 15 at 2-3.

Section 1314(m) of the Act, added by amendment in 1987, requires EPA "biennially" to "publish in the Federal Register a plan which shall" among other things "establish a schedule for the annual review and revision of promulgated *effluent guidelines*, in accordance with [section 1314(b)]." 33 U.S.C. § 1314(m)(1)(A) (italics added). Section 1314(m) further requires that EPA "provide for public review and comment on the plan prior to final publication." *Id.* § 1314(m)(2).

Other than establishing the requirement to review ELGs and requiring those reviews to occur in a specific timeframe, the Act does not prescribe specific methods EPA must follow in performing these reviews. *Our Children's Earth*, 527 F.3d at 851.

## B. Factual background

ELGs regulate over 35,000 direct dischargers and nearly 130,000 indirect dischargers nationwide. 3-ER-600, Program Plan 15 at 2-1. They are based on over 50 unique treatment technologies that prevent the discharge of approximately 700

billion pounds of 300 distinct pollutants per year to the nation's waters. 3-ER-600, Program Plan 15 at 2-1; *see* 40 C.F.R. Subchapter N. Every year, EPA reviews discharge data from all 59 regulated source categories and evaluates whether their ELGs should be revised, as well as whether any new source categories should be regulated. The Agency's most recent review evaluated data detailing 167 billion pounds of pollutant discharges. 3-ER-618, Program Plan 15 at 5-5.

### 1. EPA's annual review of all existing ELGs

As noted above, section 1314(m) of the CWA requires EPA to "establish a schedule for the annual review and revision of promulgated effluent guidelines" and "provide for public review and comment on the plan prior to final publication." 33 U.S.C. § 1314(m). Although this planning and public review requirement applies only to *effluent guidelines* under section 1314(b) of the Act, to increase transparency and stakeholder awareness of its review process, EPA includes information on its annual review of all components of the ELGs in its planning documents. EPA's practice is to propose a "preliminary plan," in one year, then publish a "program plan" the next year. The principal distinction between the two is that, in the former, EPA seeks public comment on its plan and review methodology, while, in the latter, the Agency responds.

In its annual review process, EPA conducts a robust, multi-part, iterative analysis that narrows a set of 59 possible ELG revisions into an increasingly

refined and manageable set of options. Although EPA has no formal regulations or guidance for its review process, it generally functions as follows, as reflected in EPA's planning documents: First, EPA conducts a Category Rankings Analysis of wastewater discharge data from all 59 source categories to identify the source categories that produce the most consequential discharges; second, the Agency completes Preliminary Category Reviews for categories identified as candidates for rule revision, which include literature reviews and more focused investigation; third, EPA undertakes Detailed Studies collecting and assessing data in granular detail from selected source categories; and finally, the Agency announces the ELGs that it intends to revise. The Agency undertakes a new nationwide Category Rankings Analysis and selected Preliminary Category Reviews every year. Detailed Studies and Rule Revisions are typically multi-year efforts.

EPA's annual review process is flexible and continually evolving, allowing the Agency to account for long-term trends, pressing concerns, and varying data sources. Since 2012, EPA's annual reviews have considered, among other things, toxicity discharges, sewage sludge, new waste streams, and unregulated wastewater discharges. 4-ER-995, Plan 15 Comment Responses at 252. EPA adjusts its Category Rankings Analysis every year to analyze available data from differing vantage points—for example, focusing on the concentration of pollutants discharged one year, and total volume of pollutants discharged another year.

*Compare* 3-ER-616, Program Plan 15 at 5-3 *with* 2-ER-452, Preliminary Plan 15 at 5-3. The Agency also considers emerging contaminants and ecological trends, as well as Administration priorities. *E.g.*, 2-ER-469, Preliminary Plan 15 at 6-1 (discussing EPA's cross-industry review of nutrient pollution). EPA sometimes selects a source category for further study on these bases even if that category did not rank particularly highly in the Category Rankings Analysis. *E.g.*, 2-ER-449, *id.* at 4-1 (announcing further study of Landfill discharges).

Among the Agency's current priorities is a sweeping, nationwide effort to combat harmful contamination from per- and poly-fluoroalkyl substances, or PFAS. 1-SER-8, PFAS Strategic Roadmap at 5. Often called "forever chemicals," PFAS compounds have been widely used since the 1940s, but more recently have been linked to adverse environmental and human health effects, including harm to the kidney and liver, as well as developmental, reproductive, and carcinogenic impacts. *Id.*; 1-SER-51, Multi-Industry PFAS Study - 2021Preliminary Report at 3-11. PFAS compounds do not easily degrade naturally and thus accumulate over time. Their mobility, extensive use, and persistence have resulted in their widespread presence in the environment. 1-SER-38, *id.* at 1-1.

The Agency is likewise working to address nutrient pollution, which is one of the most extensive, costly, and challenging environmental problems impacting water quality in the United States. 1-SER-126, Program Plan 14 at 5-2. Excessive

nitrogen and phosphorus in surface water can lead to eutrophication and harmful algal blooms, with impacts on drinking water, recreation, and aquatic life. *Id.*

EPA's annual reviews also more broadly consider available wastewater treatment technologies and environmental justice concerns. *See, e.g.*, 4-ER-1000–01, 1005–06, Plan 15 Comment Responses at 257–58, 262–63.

The steps in EPA's annual review process are detailed below.

### a. The Category Rankings Analysis

The first step in EPA's annual review process is a Category Rankings Analysis: a broad-based survey of the pollutants discharged across all 59 regulated source categories. 3-ER-614, Program Plan 15 at 5-1. This nationwide snapshot allows the Agency to identify which source categories are the biggest drivers of water pollution, and therefore where EPA's efforts may best be focused. 2-ER-488, Review of Industrial Wastewater Discharge Monitoring Report Data for Preliminary Plan 15 ("Concentration Ranking Review") at 6. This analysis is based on data reported by individual facilities in discharge monitoring reports, or "DMR data." *E.g.*, 2-ER-483, *id.* at 1; 3-ER-614, Program Plan 15 at 5-1.

All facilities that discharge pollutants directly to waters of the United States under NPDES permits are required to report DMR data. 2-ER-483, Concentration Ranking Review at 1. The dataset therefore represents more than 375,000 permitted facilities from every state and source category and is drawn from known

11

and standardized analytical methods. *Id.* This wealth of reporting makes DMR data the most comprehensive data source available, providing EPA with an apples-to-apples, screening-level view of the relative discharges of the different source categories. 2-ER-483–84, *id.* at 1–2.

The Agency undertakes quality-control measures before incorporating DMR data into the analysis. For instance, where a facility does not report DMR data for certain months, EPA makes estimates to fill in the gaps. 3-ER-671, 2021 Annual Review of Industrial Wastewater Discharges ("Loading Analysis Review") at 4. Likewise, where a data source registers outliers compared to previous years, EPA checks for potential data-entry errors. 3-ER-671, *id.* at 5.

Despite its advantages, DMR data provides a limited picture. It does not include data from indirect dischargers, and it includes only the data that facilities are required to report. 2-ER-484, Concentration Ranking Review at 2. And because DMR data is reported under the commonly used Standard Industrial Classification coding system (or "SIC codes") that does not neatly match up to the 59 regulated source categories, it does not seamlessly link all regulated facilities with the appropriate category. 3-ER-670, Loading Analysis Review at 3. For example, EPA's recent Category Rankings Analyses for the Petroleum Refinery Source category have included data from facilities coded as "Petroleum Refining," as well as similarly coded facilities like "Crude Petroleum Pipelines," and "Petroleum

Bulk Stations and Terminals." Effluent Guidelines Crosswalks –SIC to Point Source Category, 1-SER-164.

Despite these limitations, DMR data is the most comprehensive effluent discharge dataset available, and EPA therefore considers it be appropriate and useful to employ in the initial stage of the annual review process. 3-ER-670, Loading Analysis Review at 3.

### b.    Preliminary Category Reviews

At the second step in the annual review process, EPA identifies source categories for further consideration in Preliminary Category Reviews. 3-ER-612, Program Plan 15 at 4-1. While some of these source categories are drawn from the Category Ranking Analysis described above, others are selected for review based on stakeholder input and Administration priorities—such as the urgent need to address particularly harmful contaminants like PFAS and nutrient pollution. 3-ER-686, 2021 Preliminary Review of Industrial Point Source Categories ("Plan 15 Preliminary Review") at 1.

At this stage, EPA further assesses whether the selected source categories are good candidates for revision based on various factors. These include the nature of the pollutants discharged, the current state of the industry, permit reporting data, toxics release data, technical literature, environmental justice considerations, state and local regulation, available wastewater treatment technologies, and other

practical considerations. *See generally* 3-ER-676–734, Plan 15 Preliminary
Review, esp. at 2. These reviews often include investigative work, such as
obtaining individual facilities' discharge permits, evaluating process changes in the
industry, identifying advances in treatment technology inside or outside the
industry, mapping where wastewater is generated and discharged, and conducting
stakeholder outreach. *See, e.g.*, 3-ER-687, *id.*

### c. Detailed Studies

EPA's third step in determining whether to initiate an ELG revision is
typically a Detailed Study of the given source category. Based on its findings in
Preliminary Category Reviews, EPA selects one or more source categories for
close analysis in such studies. Here, EPA typically generates new primary data to
better understand the source category's discharges, typically by soliciting
information from and visiting individual facilities, and by sampling wastewater.
*See, e.g.*, 2-ER-469–71, Preliminary Plan 15 at 6-1–3 (describing EPA's Detailed
Study of the Meat and Poultry Products source category).

Detailed Studies can take multiple years to conduct. *See, e.g.*, 2-ER-469,
Preliminary Plan 15 at 6-1; 1-SER-175, 181, Electrical & Electronic Components
Detailed Study Report at 1, 7 (together indicating that the detailed study for the
Electrical & Electronic Components source category took roughly six years to
complete). Detailed Studies are particularly important where readily available

information does not indicate whether revising an ELG would be appropriate. *See, e.g.*, 3-ER-658, Program Plan 15 at A-3 (explaining the importance of conducting a Detailed Study before beginning a rulemaking). They often serve as the foundation for EPA's development of revised ELGs. *See* 3-ER-639, *id.* at 6-12. Sometimes, however, these studies reveal that revision would have a relatively minor effect, leading the Agency to conclude that its resources are better spent addressing other source categories. *See, e.g.*, 3-ER-628–29, *id.* at 6-1–2 (Detailed Study indicated that ELG revision for Electrical and Electronic Components source category was not appropriate at that time).

### d.    Rule Revisions

ELGs are generally complex regulations that address multiple types of discharges and pollutants at once. *See, e.g.*, 40 C.F.R. part 423 (Steam Electric Power Generating Point Source Category ELGs, regulating discharges of conventional, nonconventional, and toxic pollutants from four different waste streams).

EPA takes several steps to revise an ELG. First, often building on what it has learned from its Preliminary Category Review and Detailed Study, EPA reviews available information about the industry and addresses data gaps. *See, e.g.*, 3-ER-647–48, Program Plan 15 at 7-1–2 (discussing the Meat and Poultry Products ELG revision). This step often includes further information requests, site visits,

and sampling to better understand facility processes, treatment technologies, the nature of the wastewater discharges, and economic data. *Id*.

Second, EPA develops a proposed rule according to the statutory level of control technology, such as "Best Practicable Technology" (BPT), or "Best Available Technology" (BAT). *See* 33 U.S.C. § 1314(b)(1)(A), (b)(2)(B). Here EPA considers factors such as the age of equipment and facilities, available control techniques, and the cost of achieving such effluent reduction. *See* 33 U.S.C. § 1314(b)(2)(B). These analyses require significant work by experienced engineers, economists, and statisticians. *See, e.g.*, CWA Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category, Proposed Rule 89 Fed. Reg. 4474 (Jan. 23, 2024).

Third, EPA publishes and seeks comments on the proposed rule and develops a final rule. EPA typically receives thousands of comments on proposed ELGs. For example, EPA received over 21,000 comments on its recent proposed rule to revise the ELG for the Meat and Poultry Products source category. Regulations.gov, Docket ID No. EPA-HQ-OW-2021-0736.

A typical ELG rulemaking takes three full-time employees several years to complete, with a million dollars per year expended on contractor support over the course of the project. 3-ER-658, Program Plan 15 at A-3.

### e. Industrial Wastewater Treatment Technology Reviews and Database

EPA recently announced an initiative to systematically review and incorporate wastewater treatment technologies into the annual review process, including the costs of technologies and their transferability across source categories. 2-ER-466, Preliminary Plan 15 at 5-17. As of the publication of Plan 15, EPA was reviewing treatment technologies that use membranes, ion exchange, granular activated carbon treatment, and activated sludge. 3-ER-625, Program Plan 15 at 5-12. While these studies informed EPA's consideration of particular source categories in Preliminary Plan 15, they have not yet matured to the point that they can be incorporated quantifiably into the Category Ranking Analysis. *See* 2-ER-466, Preliminary Plan 15 at 5-17.

### f. Environmental Justice

EPA is also in the early stages of more formally incorporating environmental justice considerations into its annual review process. After soliciting public comment in Preliminary Plan 15, EPA developed a methodology that evaluates demographic data in the vicinity of discharging facilities. EPA used this analysis in its latest Preliminary Category Reviews and continues to explore additional ways to consider environmental justice in its annual reviews. 3-ER-626–27, Program Plan 15 at 5-13–14.

### 2. Preliminary Plan 15

Consistent with the process described above, EPA began its annual review in Preliminary Plan 15 with a Category Rankings Analysis. EPA used a concentration-based approach to identify the most significant pollutant-discharging categories. 2-ER-453, Preliminary Plan 15 at 5-4. In Preliminary Plan 15 EPA also provided updates on current studies and rulemaking efforts, and solicited comments both on its priorities and its review methodology. 2-ER-443, 475, Preliminary Plan 15 at 1-1, 7-1.

EPA likewise announced a body of work specifically to address PFAS contamination, including the publication of a cross-industry study of PFAS discharges. 2-ER-471, Preliminary Plan 15 at 6-3. Additionally, although the Landfills Source Category was not identified as a top discharger in the Category Rankings Analysis, EPA conducted a preliminary review of this category in response to comments received on Plan 14 that identified Landfills as an important source of PFAS pollution. 2-ER-464–66, Preliminary Plan 15 at 5-15–17.

Upon publication of Preliminary Plan 15, EPA was engaging or about to engage in Detailed Studies of three source categories, and revisions of regulations for another four. 2-ER-443–45, Preliminary Plan 15 at 1-2–2-2. EPA received 67 individual comments on Preliminary Plan 15. 3-ER-604–11, Program Plan 15 at 3-1–8 (summarizing public comments). Many of these comments supported EPA's

efforts to regulate discharges of PFAS. *Id.* Relevant here, commenters also recommended that EPA revise several other ELGs, including those for the Petroleum Refining, Fertilizer Manufacturing, and Plastics Molding and Forming source categories. 3-ER-609–10, *id.* at 3-6–7. EPA did not receive comments suggesting that it revise the remaining ELGs at issue in this case: Inorganic Chemicals Manufacturing, Pesticide Chemicals Manufacturing, Nonferrous Metals Manufacturing, and Organic Chemicals, Plastics, and Synthetic Fibers Manufacturing, or "OCPSF" (beyond the efforts EPA is already taking to address PFAS discharges in that source category).

### 3. Program Plan 15

As it had in Preliminary Plan 15, EPA began its review in Program Plan 15 with a Category Rankings Analysis. In Program Plan 15, however, the Agency ranked the source categories not by the relative concentration of pollutants they discharge, but by their total volume of pollutants discharged. 3-ER-615, *id.* at 5-2. Although this volume-based approach produced a different ranking than Preliminary Plan 15, EPA chose to continue to prioritize the source categories identified in Preliminary Plan 15, and to focus on investigating and regulating PFAS dischargers. 3-ER-616, *id.* at 5-3.

Of the source categories subject to Detailed Study in Preliminary Plan 15, EPA now reported that it was taking no further action regarding the Electrical and

Electronic Components category, expanding its study of the Textile Mills category, and initiating a rule revision for the Landfills category. 3-ER-598, *id.* at 1-1. As to Landfills, EPA found PFAS present in the leachate at over 95 percent of studied landfills, that 13.2 million Americans live within one mile of a landfill, and that these facilities are likely to have environmental justice impacts. 3-ER-640, *id.* at 6-13. EPA also found that landfill leachate is likely to be treatable by typical PFAS treatment technologies such as granular activated carbon, ion exchange, and reverse osmosis. 3-ER-640, *id.* at 6-13.

In Program Plan 15, EPA also announced its intention to initiate two new studies. The first is a cross-cutting study of PFAS influent discharges to publicly-owned treatment works. The second is a detailed study of the Concentrated Animal Feeding Operations source category. 3-ER-598, *id.* at 1-1. Although this category did not rank highly on the Category Rankings Analysis in either Preliminary or Program Plan 15, EPA announced this study to gain more information about how this source category contributes to nutrient pollution. 3-ER-629–30, *id.* at 6-2–3. Finally, in Plan 15 EPA provided updates on four ongoing ELG revisions. 3-ER-599, *id.* at 1-2.

In sum, as of the publication of Program Plan 15, EPA was engaged or about to be engaged in three Detailed Studies, and the revision of five categories' ELGs.

The Agency prioritized one study and one rulemaking to address nutrient pollution, and another two studies and three rulemakings to address PFAS contamination.

## SUMMARY OF ARGUMENT

1.     The Court lacks jurisdiction because this petition fails to challenge any final agency action and is therefore unreviewable under the Administrative Procedure Act (APA). An action is final if it marks the consummation of the agency's decisionmaking process and fixes rights, obligations, or otherwise gives rise to legal consequences. *Bennett v. Spear*, 520 U.S. at 177–78. Program Plan 15 does none of these things. Instead it is an Agency planning document that describes EPA's annual ELG reviews and revision priorities. At most, it announces provisional determinations to advance individual ELGs toward revision, or not, until the next annual review. But an ELG revision matures into a final agency action only when it is ultimately promulgated; and a provisional determination *not to* pursue revision of a particular ELG is tentative and will be revisited again in the next annual review. Petitioners' theory fails because they impermissibly seek a wholesale reordering of EPA's programmatic priorities by challenging a nonfinal planning document.

2.     Should the Court reach the merits, the petition fails to demonstrate that Program Plan 15 was arbitrary and capricious. To the contrary, EPA's annual review was comprehensive and practical. The Agency's priority-setting process

21

was designed to identify where ELG revisions could have the greatest potential impacts, and it was based on analysis of the best discharge data available, coupled with targeted consideration of high-priority contaminants, technology, and environmental justice. It was within EPA's discretion to structure its annual review according to these considerations, and the Agency thoroughly explained its reasoning. Petitioners have made no showing justifying substituting their own priorities for those chosen by EPA.

## STANDARD OF REVIEW

The existence of subject matter jurisdiction presents a question of law considered de novo by the court of appeals. *Kruso v. Int'l Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir. 1989).

This Court's review of EPA's discretionary actions in cases arising under section 1369(b) of the Clean Water Act is governed by the Administrative Procedure Act. *See Am. Mining Cong. v. EPA*, 965 F.2d 759, 763 (9th Cir. 1992). The Agency's action must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,

499 F.3d 1108, 1115 (9th Cir. 2007) (citation omitted). The Court "is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

Agency action is arbitrary and capricious only if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.* Generally, an agency's decision "will be upheld as long as there is a rational connection between the facts found and the conclusions made." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011).

Judicial review of decisions *not to* pursue rulemaking is "extremely limited" and "highly deferential," leaving agencies with "broad discretion to choose how best to marshal [their] limited resources and personnel to carry out [their] delegated responsibilities"). *Massachusetts v. EPA*, 549 U.S. 497, 527–28 (2007).

## ARGUMENT

**I.     This Court lacks jurisdiction to hear this case because Program Plan 15 is not a final agency action.**

This petition should be dismissed on jurisdictional grounds because it challenges no final agency action. Although Clean Water Act at 33 U.S.C. § 1369(b)(1)(E) provides jurisdiction for this Court to review EPA actions relating to the promulgation of ELGs, the jurisdictional provisions of the Administrative

Procedure Act must also be met for the case to be heard. *See, e.g.*, *Am. Mining Cong.*, 965 F.2d at 763 (reviewing EPA's actions in a section 1369(b) challenge under the APA). A jurisdictional prerequisite to review under the APA is "final agency action." *See* 5 U.S.C. § 704; *see also City of San Diego v. Whitman*, 242 F.3d 1097, 1102 (9th Cir. 2001). EPA's annual ELG reviews fall outside the statutory definition of "agency action," much less the definition of "final agency action."

## A. Program Plan 15 is not an "agency action" under the Administrative Procedure Act.

EPA's Program Plan 15 is not reviewable because it does not involve an "agency action"—which the APA defines as "the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The term is limited to "circumscribed, discrete agency actions." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). This principle precludes broad programmatic attacks seeking the wholesale improvement of executive-branch programs by judicial decree, and saves courts from becoming enmired in day-to-day agency management. *Id.* at 64–65 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)).

Petitioners contend that Program Plan 15 contains reviewable agency decisions not to revise certain ELGs. *See* Pet. Br. at 22. This theory mischaracterizes the Plan, where EPA made no final decisions to revise—or not

24

revise—anything. Instead, it is a forward-looking, interlocutory statement of what the ELG program hoped to accomplish, given EPA's priorities and resources, at the time it was published. Unlike a circumscribed, discrete action, Program Plan 15 contains no binding rule, order, license, sanction, relief, nor the equivalent or denial thereof. The challenge here is therefore not a suit to correct an unlawful "agency action" that would be reviewable under the APA, but an impermissible attempt to redirect an overarching agency program.

### B. Program Plan 15 is not a final agency action.

Agencies' actions are final under the APA only if two criteria are met. First, the action must mark the "consummation of the agency's decisionmaking process"—rather than being of a "merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. at 177–78. Second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Id.*

As this Court recently explained, "[i]n determining whether an agency's action is final, we look to whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations of the subject party, or if immediate compliance with the terms is expected." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (quoting *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th

Cir. 2006)). This inquiry "'focus[es] on the practical and legal effects of the agency action,' not on labels, and finality is 'interpreted in a pragmatic and flexible manner.'" *Id.* Program Plan 15 is an Agency planning document with no direct and immediate day-to-day effect, and it meets neither prong of the *Bennett v. Spear* test.

    As to the first of the *Bennett v. Spear* criteria, EPA's annual ELG reviews mark not the end—but the beginning—of a decisionmaking process. Every year, EPA conducts a Category Rankings Analysis to gain a holistic understanding of nationwide water pollutant discharges. It may then select a given source category for further analysis in a Preliminary Category Review, either because it ranked highly in the nationwide Category Rankings Analysis or because it is a regulatory priority for other reasons. EPA may then choose to initiate a Detailed Study on the source category. After completing the study, the Agency may announce its intention to revise the regulations for that source category. The entirely separate process of developing a proposed rule, taking comment on it, and issuing a final rule occurs after that. Only when EPA adopts a final rule has the decisionmaking process been consummated.

    Given this iterative review process, the Agency's determination to advance an ELG toward potential revision can hardly be deemed a definitive statement of EPA's settled intention to undertake a rulemaking. Likewise, any determination

not to advance an ELG toward rulemaking is merely provisional, applying only "*at this time.*" 3-ER-613, Program Plan 15 at 4-2 (emphasis added); *see also id.* ("EPA will continue to review all point source categories while preparing the next plan."). EPA will re-examine the ELG again the next year. EPA's annual reviews are therefore archetypical "tentative or interlocutory" action, rather than the Agency's expression of its "arriv[al] at a definitive position." *See S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 578–79 (9th Cir. 2019)

For much the same reasons, Program Plan 15 was likewise not an action "by which rights or obligations have been determined," or "from which legal consequences will flow" under the second prong of *Bennett v. Spear. See* 520 U.S. at 178. While Program Plan 15 sets out EPA's regulatory agenda, it announces no legally binding actions because the ELGs themselves cannot be promulgated without notice and comment rulemaking that would determine the substance of any revision. Any determination merely to *begin* a rulemaking, however, is not subject to judicial review. *See Bethlehem Steel Corp. v. EPA*, 782 F.2d 645, 655 (7th Cir. 1986) ("When an agency has discretion as to whether or not to undertake rulemaking, the courts cannot tell it how to exercise that discretion."). Jurisdiction attaches only when the rule is finalized. 5 U.S.C. § 704. Similarly, EPA's provisional determinations *not to* prioritize source categories for further review or

rulemaking in ELG plans do not bind EPA or third parties and are revisited annually. 3-ER-613, Program Plan 15 at 4-2.

In *Center for Biological Diversity v. Haaland* this Court heard a similar challenge to an agency planning document. In that case the document was a Grizzly Bear Recovery Plan that had been adopted by the Fish and Wildlife Service in 1975 under the Endangered Species Act. 58 F.4th at 414. The Endangered Species Act's planning provisions are more prescriptive than those at issue in CWA section 1314(m). There, the Service's planning document was required to include "'a description of such site-specific management actions as may be necessary to achieve the plan's goal'; 'objective, measurable criteria' that will lead to the species delisting; and 'estimates of the time required and the cost' for measures and intermediate steps to achieve the plan's goal." *Id.* at 414–15 (quoting 16 U.S.C. § 1533(f)).

Despite finding that, under the Endangered Species Act, "the agency [was] obligated to work toward the goals set in its recovery plan," the *Haaland* Court found that the plan was not a binding final agency action. *Id.* at 418. Instead, it followed the D.C. Circuit in finding plans of this kind more akin to regulatory roadmaps. The *Haaland* Court's reasoning transposes easily to the case at hand:

> Thus, although the Service had the statutory obligation to draw up a roadmap for recovery of the grizzly bear, "legal consequences do not necessarily flow from that duty, nor do rights or obligations arise from it." Although the map the Service drew may well help the agency

28

> "chart [its] course," adopting the map is not an agency action "by which rights or obligations have been determined, or from which legal consequences will flow."

*Id.* (internal citations omitted). Like the Grizzly Bear Recovery Plan in *Haaland*, Program Plan 15 "does not change [EPA's] statutory obligations, alter the rights of [Petitioners] or any other third party, or give rise to any binding legal consequences." *Id.* at 419. Nor does it "impose an obligation, deny a right, or fix some legal relationship." *Id.* Neither does it serve as the basis to initiate enforcement actions. *Id.* at 418. In short, Program Plan 15 "does not bind anyone to anything." *Id.* at 419 (quoting *S. Cal. All. of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 837–38 (9th Cir. 2021)). Instead, Program Plan 15 is simply "a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them," and therefore is not final agency action. *See Norton*, 542 U.S. at 71.

### C. EPA's periodic revision determinations within ELG plans are themselves not final actions.

The fact that Program Plan 15 described EPA's statutorily mandated review of the 59 source categories' regulations does not convert the Plan into a reviewable final agency action. Although EPA's review of the ELGs is mandatory, its

29

provisional determinations whether or not to revise individual ELGs in its annual plans are discretionary, non-final actions.[2]

The CWA requires EPA to periodically review and, if appropriate, revise its *effluent limitations*, *effluent guidelines*, *new source performance standards*, *pretreatment standards*, and *pretreatment guidelines*. 33 U.S.C. §§ 1311(d); 1314(b), (m), (g); 1316(b)(1)(B); 1317(b)(2); *see supra* at 6–7. Just as EPA combines the development of the components of regulations into a single ELG rulemaking, the Agency also consolidates its various periodic *review* obligations for each into a single annual review of all 59 promulgated ELGs.[3] *See* 3-ER-602, Program Plan 15 at 2-3. EPA uses its section 1314(m) plans as a vehicle to describe its annual ELG reviews. *See id.*

This Court discussed EPA's review-and-revise obligations for ELGs in *Our Children's Earth Foundation v. EPA*, 527 F.3d 842 (9th Cir. 2008). The Court began by noting that "[i]t is undisputed that EPA has an obligation to review effluent guidelines and limitations for possible revision, and that such a review is

---

[2] A party can seek a judicially reviewable revision determination on a particular ELG by petitioning the Agency for the rulemaking under section 553(e) of the APA. One such petition is pending, requesting EPA's revision of ELGs for two source categories.

[3] The Ninth Circuit noted this practice in *Our Children's Earth*, 527 F.3d at 849. The Supreme Court has approved of EPA's consolidation of its duties under Clean Water Act sections 1311 and 1314 in view of the highly technical nature of ELGs. *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. at 126–37.

mandatory." *Id.* at 849. But the Court also noted that, in any given review, "EPA's ultimate decision whether to revise the guidelines and limitations is discretionary, as 'appropriate.'" *Id.*

Although EPA must periodically review its ELGs, its interlocutory determinations whether or not to advance ELGs toward revision are not reviewable final agency actions. As discussed above, they are not definitive statements of EPA's position, they have no direct or immediate effect on the day-to-day operations of the Agency or anyone else, and they do not demand any immediate compliance. *See Haaland*, 58 F.4th at 417.

Even if EPA's periodic review-and-revise determinations under the CWA were mandatory in the sense that EPA could be compelled to make such determinations in a citizen suit (and no court has decided that they are)—it does not follow that the mandatory nature of these duties by itself would make EPA's nonbinding ELG prioritization reviewable final agency action.

This Court's consideration of the Grizzly Bear Recovery Plan in *Haaland* illustrates this point: there the Court recognized that, although an agency must meet its mandatory statutory obligations, those obligations do not necessarily give rise to reviewable final agency actions. 58 F.4th at 418 ("[A]lthough the Service had the statutory obligation to draw up a roadmap for recovery of the grizzly bear . . . adopting the map is not an agency action by which rights or obligations have

been determined, or from which legal consequences will flow") (internal quotation marks and citation omitted); *see also Lujan*, 497 U.S. at 891 (a program's failure to meet statutory obligations to "revise land use plans in proper fashion," "submit certain recommendations to Congress," and "consider multiple use," among other things, does not mean a right of review under the APA absent final agency action).

As the Court noted in *Haaland*, the finality inquiry is both case-specific and pragmatic. 58 F.4th at 417. It addresses the real-world consequences of the action at issue rather than how an action is labeled and asks if the action "amounts to a definitive statement of the agency's position" or has a "direct and immediate effect on the day-to-day operations of the subject party." *Id.* As a practical matter, EPA's revision determinations are provisional rather than definitive, and have no direct or immediate day-to-day effects. They are not, in any final sense, "yes" or "no" determinations whether to revise the ELGs. *See* 3-ER-603, Program Plan 15 at 2-4.

That courts have found that superficially similar review-and-revise provisions in the Clean Air Act give rise to judicially reviewable final action does not dictate that the Clean Water Act's review-and-revise provisions likewise do so. In *Environmental Defense Fund v. Thomas*, the Second Circuit found that the Clean Air Act's provisions obligating EPA to periodically review and revise National Ambient Air Quality Standards (NAAQS) required that "the Administrator must make *some* decision regarding the revision of the NAAQS that

32

is thereafter reviewable" as a final action under the APA. 870 F.2d 892, 896 (2d Cir. 1989). This holding is specific to the provision of the Clean Air Act at issue in *Thomas*, *see id.*, which is distinct from the Clean Water Act provisions here.

To begin with, the challenge in *Thomas* was a citizen suit alleging that EPA had a nondiscretionary duty to revise the relevant NAAQS, *id.* at 895, whereas here Petitioners challenge an exercise of the Agency's discretion in a planning document. Were Petitioners to allege that EPA had a nondiscretionary duty to revise the ELGs for their seven categories, their case would belong in district court under the CWA's citizen-suit provision (to the extent this would be consistent with *Our Children's Earth*). *See* 33 U.S.C § 1365(a)(2); 527 F.3d at 846–47.

Second, the Clean Air Act regime in *Thomas* required procedures that are not present here. There, the court found that EPA was required to use rulemaking procedures to determine whether or not to revise the NAAQS in question. 870 F.2d at 900. The CWA's review-and-revise provisions require no such formal decisionmaking process—and it cannot credibly be argued that Congress intended otherwise—as this would impracticably require EPA to undertake lengthy APA rulemaking procedures to decide whether to revise ELGs for 59 source categories every single year.

Equally importantly, the scope of the review in *Thomas* was far narrower. There EPA was required to review NAAQS for just six criteria pollutants once

every five years, unlike the ongoing review of all 59 ELGs that EPA administers here under the Clean Water Act. 870 F.2d at 895. This distinction is generalizable as between the two statutes: the Clean Air Act often contemplates discrete five- and eight-year review cycles for revision determinations, *see, e.g.*, 42 U.S.C. §§ 7409(d)(1), 7411(b)(1)(B), while the Clean Water Act's review-and-revise provisions largely take place on a rolling basis, requiring review "from time to time" or annually. 33 U.S.C. §§ 1314(b), (g)(1); 1316(b)(1)(B); 1317(b)(2). The Clean Water Act's provisions, especially as EPA practically administers them, result in an iterative and ongoing review process rather than discrete cyclical decisions.

The Clean Air Act's review scheme is further distinguishable because that statute contains no analogue to the Clean Water Act's section 1314(m), requiring a public planning document for such reviews. EPA's annual publication of ELG plans allows members of the public to monitor EPA's consideration of individual source categories. Should someone be dissatisfied with EPA's intentions on a given source category, they can comment on EPA's preliminary plans, or petition the Agency to revise the given ELG under APA section 553(e). Or they could allege under the CWA's citizen-suit provision that EPA had a nondiscretionary statutory duty to revise the ELG, to the extent that this theory is consistent with *Our Children's Earth*.

But given the statute's ongoing and transparent ELG review procedures, it makes little sense to assume that Congress intended for these reviews to be treated as final agency actions on nearly 60 source categories, challengeable every year by any interested person not satisfied with EPA's approach. Granting Petitioners relief on these terms would result in precisely the kind of blanket programmatic reordering that the Supreme Court has cautioned against. *See Lujan*, 497 U.S. at 891 ("[R]espondent cannot seek wholesale improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.").

### D. Petitioners failed to preserve their claims for four of the seven source categories at issue, and are therefore barred from raising them before the Court.

The Court should not reach Petitioners' arguments regarding the revision of individual ELGs because Program Plan 15 contains no final agency actions, and therefore is not reviewable. However, should the Court find that Program Plan 15 is indeed reviewable, Petitioners nonetheless forfeited their claims for four of their seven chosen source categories by failing to address them in public comments. Neither the Petitioners, nor anyone else, submitted comments on Preliminary Plan 15 asking EPA to revise the ELGs for Inorganic Chemical Manufacturing, OCPSF (aside from the PFAS contaminants that they Agency is already addressing), Pesticide Chemical Manufacturing, or Nonferrous Metals Manufacturing.

The doctrine of administrative waiver requires challengers to government action to present timely and "particular objections" that "alert[] the agency to the [parties'] position and contentions" and allow "the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004). This principle "protects the agency's prerogative to apply its expertise, to correct its own errors, and to create a record for [judicial] review." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007). Although the administrative waiver doctrine is not appropriate in all disputes, the rule has been routinely applied in cases like this one, arising out of agency action following public comment. *E.g.*, *Advocs. for Highway & Auto Safety v. Fed.Motor Carrier Safety Admin.*, 429 F.3d 1136 (D.C. Cir. 2005); *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1249 (9th Cir. 2000); *Mich. Dep't of Env't. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000).

Because Petitioners failed raise their concerns as to four of the seven source categories before the Agency, the Court should therefore deny the Petition as to those source categories on the basis of administrative waiver alone.

## II. EPA has broad discretion over the content of its annual review process.

If the Court reaches the merits of this case, it should find that EPA's Program Plan 15 meets the Agency's substantive obligations under the Clean Water Act. EPA's longstanding practice for ELG reviews prioritizes factors such

as these: which source categories are the largest pollutant dischargers, where there is the greatest potential to curb pollutant discharges, which pollutants present the most significant threats to human health and the environment, and how the Agency's available resources can best be used. The Court should reject Petitioners' attempt to impose their own review scheme onto the Agency for two reasons. First, the Clean Water Act's provisions governing the review of ELGs leave EPA with a great deal of discretion; and second, Petitioners' arguments about mandatory considerations are unsupported by statute and precedent.

### A.    The Clean Water Act gives EPA discretion in structuring ELG reviews.

Congress entrusted EPA with broad discretion over the content of its annual review process. While the CWA sets specific requirements that apply "[f]or the purpose of *adopting* or *revising* effluent limitations," 33 U.S.C. § 1314(b) (emphasis added), it offers EPA a free hand in determining how to *review* existing ELGs. *See Our Children's Earth*, 527 F.3d at 851.

EPA's discretion in structuring its ELG review is especially evident when considered next to the Act's requirements for EPA's development of the ELG rules themselves. When developing a rule, the Act prescribes, for example, that a given ELG regulation "shall" identify "the degree of effluent reduction attainable through the application of the best control measures and practices available," 33 U.S.C. § 1314(b)(2)(A), and that, in setting that control level, EPA "shall" "take[]

37

into account" a nonexhuastive list of considerations, which the Petitioners term

"mandatory factors." These are:

> the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate.

33 U.S.C. § 1314(b)(2)(A), (B).

By contrast, the Act contains no such directives in EPA's recurring

obligation to review existing ELGs. Instead, these review obligations are set out in

broad terms. Again, these obligations are as follows. EPA must:

- "[R]eview[] at least every five years and, if appropriate, revise[]" *effluent limitations*, 33 U.S.C. § 1311(d);

- At "least annually . . . revise, if appropriate, [*guidelines for effluent limitations*]," *id.* § 1314(b);

- "[F]rom time to time, as technology and alternatives change, revise [*new source performance*] *standards*," *id.* § 1316(b)(1)(B) (italics added).

- "[F]rom time to time, as control technology, processes, operating methods, or other alternatives change, revise [*pretreatment*] *standards*." *id.* § 1317(b)(2) (italics added); and

- "[R]eview at least annually . . . and, if appropriate, revise *guidelines for pretreatment*," *id.* § 1314(g)(1) (italics added).

38

These provisions fall well short of the highly prescriptive factors that Congress set out for consideration in the development of the ELGs themselves, such as "the engineering aspects of the application of various types of control techniques." 33 U.S.C. § 1314(b)(2)(B). This distinction demonstrates Congress's intent to give EPA broad discretion in determining its annual review process. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 126 (2018) ("Courts are required to give effect to Congress' express inclusions and exclusions, not disregard them.").

### B. Petitioners erroneously read review requirements into the Clean Water Act that Congress did not create.

Petitioners contend that the Clean Water Act requires EPA to consider a host of factors in its periodic reviews of ELGs. Their main contention—that annual reviews must be driven by the requirements for setting BAT levels—is not supported by the statute and has already been rejected by this Court. Their additional arguments about the consideration of zero-discharge limits, outdated control levels, previously unaddressed pollutants, and stormwater are foreclosed by the same authorities.

### 1. There are no "mandatory factors" in EPA's annual review of all 59 source categories.

Petitioners argue that EPA' holistic consideration of relative pollutant discharges across the 59 source categories at the initial stage of its annual review

process was unlawful, and that the Agency's review should instead have been driven by what they call the "mandatory factors."[4] Pet. Br. at 25–30. These are the section 1314(b)(2)(B) factors for setting BAT levels in promulgated ELGs. But, as discussed above, these factors are mandatory to the development and revision of ELGs, not to their review.

That the statute nowhere dictates the content of EPA's annual review process alone should be sufficient to defeat Petitioners' claim that the consideration of any particular factors at that stage is mandatory. It is "a fundamental principle" of statutory interpretation that "absent provisions cannot be supplied by the courts." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019). Because Congress's broad mandate places no strictures on EPA's conduct in its periodic reviews of ELGs, "courts generally may not "impos[e] limits on [the] agency's discretion." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).

But Petitioners' "mandatory factors" theory is not only belied by the text of the statute; it has already been rejected by this Court. In *Our Children's Earth*, the Court considered whether EPA had a nondiscretionary duty, actionable under the CWA's citizen-suit provision, to account for the very same "mandatory" section

---

[4] Contrary to Petitioners' assertions, Pet. Br. at 29, EPA responded to public comments offering the same critique. 4-ER-995–97, Plan 15 Comment Responses at 252–54.

1314(b)(2)(B) factors in ELG review. 527 F.3d at 845, 849. The Court explained that consideration of these factors represented a "technology-based approach"—focusing on the achievable level of pollutant reduction given current technology. *Id.* at 845. EPA had instead conducted its annual review using what the Court called a "hazard-based" approach, which "[sought] to identify known hazards or contaminants in the water and to reduce the prevalence of those hazards." *Id.*

Petitioners lean heavily on the Court's observation there that "the overall structure of the [Act] strongly suggests that any *review* to determine whether revision is appropriate should contemplate the mandatory technology-based factors." Pet. Br. at 27 (citing 527 F.3d at 851) (emphasis in *Our Children's Earth*). But they ignore the second half of this sentence, as well as the central holding of the case, where the Court followed up the observed *suggestion* that ELG review should contemplate the 1314(b)(2)(B) factors with a clearer finding: "the statute does not expressly and unequivocally state as much." 527 F.3d at 851.

The Court went on, "[n]othing in the [Act] specifically obligates the EPA to *review* the effluent guidelines and limitations using a technology-based approach." *Id.* at 851 (emphasis in original). "At most," the Court concluded, "the statutory provisions and legislative history are ambiguous." *Id.* Reasoning that it would be inappropriate to "divine a 'specific, unequivocal command,' from an amalgamation of disputed statutory provisions and legislative history," the Court held that "the

statute falls short of imposing a mandatory duty and thus the review criteria are not properly before the court under [the Act's citizen-suit provision]." *Id.* Accordingly, it was within EPA's discretion to conduct is annual review using the hazard-based approach, rather than the technology-based approach that the plaintiffs there, like Petitioners here, claimed to be mandatory.

The holding in *Our Children's Earth* applies here despite the fact that that case arose in the context of a nondiscretionary duty suit. Petitioners now allege that EPA acted arbitrarily in carrying out essentially the same conduct that this Court approved of in that case. There, the Court held that it was within EPA's discretion to conduct its review without regard to "mandatory factors." The Agency's review procedures here—ranking source categories in Preliminary Plan 15 according to the pollutant concentrations in their discharges, and in Program Plan 15 according to the total volume of their discharges—is consistent with the "hazard-based" approach that *Our Children's Earth* refused to displace. This Court has therefore already rejected the thrust of Petitioners' theory.

Petitioners make a further, equally meritless, argument on the basis of the 1314(b)(2)(B) factors. They cite the Fifth Circuit's decision in *Southwestern Electric Power Company* (*SWEPCO*) *v. EPA*, 920 F.3d 999 (5th Cir. 2019), for the proposition that "no [section 1314(b)(2)(B)] factor allows the agency to consider the amount of pollutants generated by one wastestream relative to other streams."

42

Pet. Br. at 27–28 (citing 920 F.3d 999, 1026 (5th Cir. 2019)). In doing so, Petitioners ignore once again that, consistent with this Court's guidance in *Our Children's Earth*, the statutorily prescribed considerations in setting the BAT control level apply when revising, but not when reviewing, an ELG. 920 F.3d at 1023. Accordingly, the Fifth Circuit's decision in *SWEPCO* regarding EPA's rulemaking to revise an ELG has no bearing on this case.

> **2.    Zero-discharge limits, control-levels adjustments, and unregulated pollutants and wastestreams are required considerations for the *revision* of ELGs, but not in their *review*.**

Petitioners assail Plan 15 with a throng of additional purportedly mandatory considerations that they claim EPA unlawfully ignored in its annual review. They assert that EPA was required to consider zero-discharge limits in its review process, Pet. Br. 62–63, that BAT control-level limits for their seven chosen categories are out of date, *id.* at 44–47, and that EPA overlooked controls for previously-unaddressed pollutants as well as currently-unregulated stormwater runoff. *Id.* at 47–62. But, like consideration of the section 1314(b)(2)(B) factors, none of these obligations attach to EPA's annual review of the 59 source categories. They apply only to EPA's development of the revised rules, not its provisional annual determinations whether to revise them. These arguments are addressed in turn below.

As to zero-discharge limits, the statute specifies that "*regulations* shall . . . identify control measures and practices available to eliminate the discharge of pollutants from categories and classes of point sources." 33 U.S.C. § 1314(b)(3) (emphasis added). But it makes no mention of consideration of zero-discharge limits in the provisions for periodic *review* of the regulations. *See id.* §§ 1311(d), 1314(b), 1316(b)(1)(B), 1317(b)(2), and 1314(g)(1).

The same goes for Petitioners' arguments that the ELGs for their seven source categories must be revised because their current control levels are outdated. The statute requires that "effluent limitations" themselves "shall require application of the best available technology economically achievable for such category or class," 33 U.S.C. § 1311(b)(2)(A), and that specified pollutants "shall be subject to effluent limitations resulting from the application of the best available technology economically achievable." 33 U.S.C. § 1317(a)(2). But consideration of BAT levels is absent from the statute's provisions governing the ELGs' periodic review.

And Petitioners' argument that EPA was required to consider whether current ELGs account for all nonconventional and toxic pollutants, Pet. Br. at 47–49, fails for the same reason—this consideration appears nowhere in the statutory mandates governing EPA's *review* of ELGs. Here, citing the D.C. Circuit's decision on a Clean Air Act matter in *Louisiana Environmental Action Network*

(*LEAN*) *v. EPA*, Petitioners assert that EPA has an obligation under the Clean Water Act in its annual reviews to "set[] controls on previously unaddressed . . . pollutants." 955 F.3d 1088, 1098 (D.C. Cir. 2020). But the Clean Air Act provision at issue in *LEAN* governs EPA's standalone reviews of air emissions standards that take place only once every eight years. *See id.* at 1093. By contrast, EPA undertakes its iterative review of ELGs every year, and that process accounts for unregulated pollutants when source categories are considered in Preliminary Category Reviews and Detailed Studies. *See, e.g.*, 2-ER-464–66, Preliminary Plan 15 at 5-15–17 (discussing discharges of unregulated PFAS from the Landfills source category). Indeed, far from ignoring unregulated pollutants wholesale, EPA sometimes goes out of its way to address them, as it is now doing in an effort to regulate PFAS compounds—which had not begun to be incorporated into ELGs until recently. *See, e.g.*, 3-ER-649–50, Program Plan 15 at 7-3–4 (describing EPA's ongoing to work to revise ELGs to address PFAS discharges).

Likewise, Petitioners' argument that EPA is obligated to evaluate stormwater discharges fails for the same reason—this consideration appears nowhere in the statutory mandates for the Agency's *review* of ELGs. *See* 33 U.S.C. §§ 1311(d), 1314(b), 1316(b)(1)(B), 1317(b)(2), and 1314(g)(1). And, contrary to Petitioners' suggestion that EPA "took pains in Plan 15 to specifically avoid consideration of stormwater," Pet. Br. at 61, the Agency omitted stormwater only

45

from the concentration-based Category Rankings Analysis in Preliminary Plan 15 because it would have diluted the discharges, making the analysis less accurate. *See* 2-ER-487, Concentration Ranking Review at 5 (excluding stormwater). But EPA included stormwater in the total-volume based Category Rankings Analysis in Program Plan 15. *See* 3-ER-690, Plan 15 Preliminary Review at 5. This treatment of stormwater was reasonable and consistent with EPA's practice of looking at DMR data from different angles in different years. *See supra* at 9-10.

At bottom, Petitioners' arguments around statutory requirements that EPA purportedly ignored depend on reading obligations into the CWA that do not appear in its provisions governing ELG review. *Our Children's Earth* counsels against precisely this kind of reasoning. The Court there held that, while EPA had a duty to conduct ELG reviews, the CWA does not mandate that EPA consider the section 1314(b)(2)(B) factors in doing so. 527 F.3d at 851. Instead, Congress left the structure of ELG reviews to EPA's discretion, and EPA has reasonably developed an iterative process for those reviews that prioritizes the revision of ELGs where they can produce the most significant benefits, while also considering available technology-based controls as part of the process. In the absence of more detailed instruction, EPA's approach is reasonable and consistent with the statute's aim of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

This Court should follow *Our Children's Earth* in declining to find that Congress meant to impose more obligations on EPA's period ELG reviews than its words require. As the Supreme Court observed in another CWA case, where certain provisions are "unencumbered by specified statutory factors of the sort provided [elsewhere]," their omission can "reasonably be interpreted to suggest that the EPA is accorded greater discretion." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Because Congress chose not to prescribe the same considerations for EPA's periodic ELGs *reviews* as it does to their ultimate *revisions*, this Court should not assume the requirements apply equally to both. Instead, the Court should deny this Petition and uphold EPA's reasonable implementation of its ELG review responsibilities under the statute's broad language and EPA's experience reviewing and developing these standards over many decades.

**III.    EPA's annual review process is thorough, reasonable, and consistent with the Clean Water Act.**

The annual review process that EPA described in Program Plan 15 was reasonable and its explanation for its regulatory priorities was thorough. Petitioners provide no basis for upsetting it.

**A.    EPA's annual ELG review is a practical and iterative process that extends far beyond the Category Rankings Analysis.**

Although the Clean Water Act requires EPA to periodically review ELGs, as discussed above, the statute leaves the method of the annual review process to EPA. The Agency must annually consider regulations governing some 160,000 individual facilities across 59 source categories limiting the discharge of about 300 distinct pollutants. 3-ER-600, Program Plan 15 at 2-1, *see* 40 C.F.R. Subpart N. Given that EPA seeks to focus its regulatory efforts where they will have the greatest impact, the first step in the annual review process is a practical one: EPA looks at the most comprehensive dataset available, DMR data, and draws apples-to-apples comparisons to determine which categories are the greatest sources of pollutants.

Contrary to Petitioners' suggestion, *see* Pet. Br. at 3, EPA's annual cross-category comparison of DMR data is only the first step in an iterative priority-setting process. Categories where revisions can yield significant pollutant reduction are selected for further study in Preliminary Category Reviews, where

48

EPA examines technical literature, available control technologies, and many other factors. *See generally* 3-ER-676–734, Plan 15 Preliminary Review, esp. at 2.

For source categories where revision appears promising, EPA conducts Detailed Studies in which the Agency collects its own data and closely analyzes the potential pollution reductions that might be achievable by an ELG revision. *See supra* at 14–15. Should EPA choose to revise the regulation for a given source category, the Detailed Study informs the development of the rule. While developing a proposed rule revision, EPA further refines its data about the source category and incorporates consideration of the factors identified in the CWA for the promulgation of rules. *See, e.g.*, 33 U.S.C. § 1314(b)(2)(B).

Contrary to Petitioners' claims, many limitations in DMR data used in EPA's annual Category Ranking Analysis are controlled for and eliminated as the Agency advances an ELG category through the steps in the review process, focusing its analysis to a more granular level on each successive pass. Equally significantly, while EPA's annual Category Rankings Analysis provides an important screening-level evaluation tool, the Agency does not rely solely on DMR data to identify which categories to prioritize for further review. True, EPA often chooses to advance a category to further study and potential revision on the basis of this data. But EPA also exercises its discretion to target regulatory efforts toward particularly harmful emerging contaminants that, although not necessarily

reflected in DMR data, have important public health and environmental consequences. For example, in Preliminary Plan 15, EPA announced a detailed study of the Landfills source category as a potentially significant contributor of PFAS pollution even though it ranked only twenty-sixth in the Category Rankings Analysis. 2-ER-457, 464, Preliminary Plan 15 at 5-8, 15.

And EPA continually refines its use of DMR data in even this screening-level capacity, revising its annual review methodology every year, and taking comment on it every other year, to hone its review efforts. *See* 4-ER-995–96, Plan 15 Comment Responses at 252–53. The Agency has also announced efforts to couple a systematic review of wastewater treatment technologies and environmental justice considerations with its use of DMR data in future reviews. 2-ER-466, Preliminary Plan 15 at 5-17; 3-ER-626, Program Plan 15 at 5-13.

### B. EPA adequately explained its reasoning and was not required to say more about those categories that it will consider again in future years.

Petitioners' claim that EPA failed to adequately explain its actions in Program Plan 15 misunderstands both the nature of EPA's annual ELG review process and the requirements imposed by arbitrary and capricious review. Pet. Br. at 63–65. Under such review, an agency must show that it examined "the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at

43 (citation omitted). Agencies must explain a reasonable basis for their decisions. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*, 499 F.3d at 1115.

EPA did exactly what was required of it here, explaining the basis for its regulatory priorities in a 67-page document. Program Plan 15 discussed, for example, that EPA was initiating a nationwide study of industrial discharges of PFAS to publicly-owned treatment works in order to "fill a crucial data gap in the agency's efforts to establish technology-based limits for PFAS." 3-ER-646, Program Plan 15 at 6-19. Likewise, EPA announced that, based on extensive data collection and a Detailed Study, the Agency had made several findings that support revising the ELG for the Landfills source category. 3-ER-639–40, *id.* at 6-12–13. Among these, that PFAS leachate was present in discharge data from over 95 percent of 200 evaluated landfills, that environmental justice concerns are raised by a significant percentage of the 13.2 million people that live near landfills, and PFAS leachate was likely to be effectively addressed with available treatment technologies. 3-ER-640, *id.* at 6-13.

Petitioners' argument that EPA was required to similarly explain why, in Program Plan 15, it did not elect to take further action on their chosen source categories distorts the Agency's duty to explain its decisionmaking. *See* Pet. Br. at 63–65. The heart of this argument is Petitioners' oft-repeated misconception that

51

EPA affirmatively chose, in any determined and final sense, not to revise the ELGs for their seven chosen categories for the foreseeable future. *E.g.*, Pet. Br. at 3, 18, 22–29. Their brief supposes that EPA reviewed each of their seven source categories in isolation (and presumably every other source category too) and found present regulations for each to be adequate—that there would be no benefit to revision. *See, e.g.*, Pet. Br. at 55. This argument misunderstands EPA's task in annually reviewing ELGs for all 59 source categories. EPA does not separately consider the soundness of each category's regulations in a vacuum, as it might in an eight-year review cycle for a Clean Air Act emission standard. Instead, it annually considers all of the regulated source categories holistically and asks a simple and practical question: where can the next ELG revisions do the most good?

Yet Petitioners ask this Court to treat EPA's statement of its affirmative intentions to pursue revisions of ELGs for the Metal Finishing, OCPSF, and Landfills source categories as final determinations *not to* pursue rulemakings for their chosen source categories. Pet. Br. at 6. By this logic, EPA made equally final determinations not to pursue rulemakings for all source categories not currently subject to revision efforts. Their theory would require EPA to annually explain why the Agency had chosen, only for that year, not to pursue rule revisions in each case—as the Agency might do in responding to a petition for rulemaking. Petitioners' demand for a detailed explanation of EPA's provisional revision

determinations for every source category, every year, would elevate exhaustive form over practical function. The Court should decline Petitioners' request to saddle EPA with this unwarranted procedure.

### C. EPA reasonably relied on DMR data at the initial stage of its annual review.

Petitioners object to EPA's use of SIC codes to classify different facilities into ELG source categories for purposes of the Category Rankings Analysis. Pet. Br. at 30–33. They argue, for example, that EPA's approach did not accurately portray discharges from the Petroleum Refining source category. *Id.* at 31–32.

Petitioners argue that EPA's use of SIC codes is both overinclusive, capturing facilities that are not in a given source category; and underinclusive, in that not all facilities' data in incorporated into EPA' analysis because it is not reported in a form usable for EPA's analysis. Pet. Br. at 32–33. For instance, although there are about 140 petroleum refineries in the United States, EPA included data from 331 facilities for the Petroleum Refining source category in Plan 15's Category Ranking Analysis. Pet. Br. at 31; 2-ER-495, Concentration Ranking Review at 13; *see* 3-ER-670, Loading Analysis Review at 3. At the same time, Petitioners argue that EPA's analysis was arbitrary because the Agency was unable to account for twenty Texas refineries that report data in daily reports, whereas EPA's Category Rankings Analysis considered monthly averages. Pet. Br. at 32.

As to Petitioners' objection of over-inclusivity, it is admittedly EPA's practice to err on the side of sweeping additional facilities into a source category rather than erroneously excluding those that belong there. For this reason, EPA's consideration of Petroleum Refining SIC codes included data from NPDES-permitted pipelines and storage terminals—which, although not refineries themselves—are topically related to the source category. *See supra* at 11–13. While this mismatch could skew EPA's analysis, two features in EPA's rankings mitigate this possibility. First, EPA's over-inclusive use of SIC codes is repeated across every source category, which, in the aggregate, should go some distance toward cancelling out the effects of over-representation in any single category. *See* 1-SER-151–165, Effluent Guidelines Crosswalks –SIC to Point Source Category. Second, EPA controls for some imprecisions by evaluating DMR data differently year over year. *See* 4-ER-995–96, Plan 15 Comment Responses at 252–53 (summarizing the varied approaches EPA has taken to the screening analyses since 2012). In Preliminary Plan 15 for instance, EPA ranked source categories by the concentration of their pollutant discharges, while in Program Plan 15, EPA ranked source categories by the total volume of their pollutant discharges. *See supra* at 9–10. EPA had the benefits of both analyses before it in its annual review in Plan 15. 3-ER-612, Program Plan 15 at 4-1.

Despite its over-inclusivity, EPA's use of SIC codes to classify DMR reporting into different source categories is a reasonable approach to using this valuable, easily analyzable nationwide dataset. The alternative that Petitioners apparently prefer—facility-by-facility classification decisions for 375,000 individual dischargers—would be impractical and ill-suited to EPA's annual review process.

As to under-inclusivity, EPA acknowledges that one major limitation of DMR data is that it does not account for all discharging facilities—indeed, such data is collected only from NPDES-permitted direct dischargers, so it necessarily excludes indirect dischargers. 2-ER-483, Concentration Ranking Review at 1. Petitioners likewise argue that different permitting authorities require different sets of pollutants to be monitored. Pet. Br. 35.

Petitioners' objections ignore that EPA does not count on DMR data to be faultless. The Agency uses the data that is available, analyzing what can be analyzed, to make general comparisons of industries' relative pollutant discharges and trends over time in its Category Rankings Analysis. *See, e.g.*, 3-ER-614–18, Program Plan 15 at 5-1–5 (describing the Category Rankings Analysis). As this Court observed in a case under the Endangered Species Act, it is reasonable for an agency to rely on the "best scientific data available," even if it is not the "best scientific data possible." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747

F.3d 581, 602 (9th Cir. 2014) (cleaned up); *see also id.* ("we cannot insist on perfection"). For its flaws, there is simply no better alternative than the wealth of information supplied by DMR data for EPA's yearly screening-level reviews.

> **D.** **Petitioners' claims that EPA ignored advances in technology and its own relevant studies misunderstand the nature of EPA's annual review process.**

Central to Petitioners' claims that EPA ignored relevant considerations is their confusion of the *first step* in Agency's annual review process—the Category Rankings Analysis—with the annual review process as a whole. *See* Pet. Br. at 3. Contrary to Petitioners' suggestion, EPA's prioritization is informed not just by the Agency's initial screening-level review, but also by Preliminary Category Reviews and Detailed Studies, which consider additional factors like the nature of the pollutants discharged, the current state of the industry, technical literature, environmental justice, state and local regulation, and available treatment technologies. *See supra* at 13–15.

Take EPA's consideration of evolving technology. Petitioners repeatedly claim that EPA "specifically designed" the Category Rankings Analysis "to avoid consideration of advances in technology and other technology-based factors." Pet. Br. at 3, 16. Setting aside this Court's holding in *Our Children's Earth* that EPA has no mandatory duty to consider these factors, 527 F.3d at 851, there is no record evidence to support Petitioners' wry suggestion that EPA developed its Category

Ranking Analysis willfully to avoid considering technology. Instead, the record demonstrates that EPA designed its Category Rankings Analysis to take advantage of the most comprehensive available data on pollutant discharges nationwide. 3-ER-669–70, Loading Analysis Review at 2–3 (explaining the advantages of DMR data). And far from ignoring advances in technology, EPA is working to systematically incorporate Industrial Wastewater Treatment Technology Reviews more broadly across categories into the annual review process. 2-ER-467, Preliminary Plan 15 at 5-17–18.

More to the point, however, are the many ways that EPA already accounts for technological developments in the annual review process. The Agency considers, among other things, the current state of the industry, technical literature, and available treatment technologies in its Preliminary Category Reviews. *See generally* 3-ER-676–734, Plan 15 Preliminary Review, esp. at 2. The Agency more closely considers available treatment technologies in Detailed Studies. *See* 3-ER-640, Program Plan 15 at 6-13 (considering granular activated carbon, ion exchange, and reverse osmosis treatment technologies in it Detailed Study of Landfills). Thus, information on available treatment technology forms an important basis for the Agency's reasoning when it reaches the point of deciding which ELG revisions to commit resources to.

As with advances in technology, EPA likewise addresses other purported gaps in its knowledge base as it advances toward revision of a given source category's ELGs. The Agency's practice of varying its review procedures gives it multiple perspectives on pollutant discharges and industry trends. *See supra* at 9–10. In the steps of the review process following the Category Rankings Analysis, running from Preliminary Category Review to Detailed Study to Rule Revision, EPA considers the potential for zero-discharge limits, the benefits that could be achieved by updating the BAT, and additional pollutants that could be accounted for.

Similarly, Petitioners' claims that EPA's annual review process ignored the Agency's own Membrane Study[5] and the Nutrient Report[6] are disproven by the record. Pet. Br. at 41–42. Membrane treatment technology was considered in the Agency's ELG revision for the Steam Electric Power Generating source category, and is a key area of focus in EPA's developing Industrial Wastewater Treatment Technology Reviews. 3-ER-647, Program Plan 15 at 7-1; 2-ER-467, Preliminary Plan 15 at 5-18. And EPA's recent investigation of the Fertilizer Manufacturing, Explosives Manufacturing, Plastics Molding and Forming, Miscellaneous Food

---

[5] Preliminary Technology Review: Membrane Wastewater Treatment Systems (Sept. 2021), 2-ER-407.

[6] The EPA's Review of Nutrients in Industrial Wastewater Discharge (Dec. 2020), 2-ER-349.

and Beverages, and Meat and Poultry Processors source categories relied on the findings of the Nutrient Report. 1-SER-131–33, Program Plan 14 at 5-7–9; 2-ER-469, Preliminary Plan 15 at 6-1. Accordingly, the fact that these studies were not considered in EPA's Category Rankings Analysis does not mean that they were disregarded in EPA's consideration of which ELGs to revise.

In sum, EPA's reasoning in selecting its regulatory priorities extends far beyond the haphazard skimming of DMR data that Petitioners describe. EPA's use of DMR data is reasonable for its purpose: conducting a high-level review of the greatest sources of pollution. But this is only the first step in a careful examination that identifies where rule revisions can have the greatest impact, and that begins anew for each source category every year. While Petitioners may not like that EPA begins its annual review with a nationwide comparison of permitting data, nor that EPA prioritizes revisions on the basis of where they will do the most good, these practices can hardly be called irrational. The petition should be denied.

## IV. Petitioners may not substitute their priorities for those of the Agency.

The Court should rebuff Petitioners' attempt to usurp EPA's role in dictating its own regulatory priorities. Their bid to do so ignores that agencies, not courts or interest groups, must judge how to allocate their limited resources based on technical, scientific, and policy considerations, and that agency decisions on this score are entitled to the highest level of deference on review. *Kleppe v. Sierra*

*Club*, 427 U.S. 390, 412 (1976); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983). Petitioners offer no basis by which to conclude that their chosen priorities are more pressing than the Agency's.

Absent contrary Congressional direction, agencies are entitled to deference on how they prioritize their work and allocate resources. *See Nat'l Cong. Of Hisp. Am. Citizens v. Marshall*, 626 F.2d 882, 888 (D.C. Cir. 1979). Petitioners fail to square their position with the broad discretion inhered upon EPA by the statute's review provisions. 33 U.S.C. §§ 1311(d), 1314(b), 1316(b)(1)(B), 1317(b)(2), and 1314(g)(1); *see supra* at 6–7.

Equally importantly, Petitioners fail to present a factual case that clears the very high bar for supplanting an agency's priorities. Courts have long acknowledged that, without prescriptive direction from Congress, "[t]he agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way," and consequently afford the utmost deference to the agency in setting its regulatory agenda. *In re Barr Lab'ys*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("Such budget flexibility as Congress has allowed the agency is not for us to hijack.").

Petitioners' request for relief here is analogous to a petition for a rulemaking asking EPA to revise ELGs for each of their seven chosen source categories. *E.g.*, Pet. Br. at 3. And, as is the case in judicial review of rulemakings petitions, the

Court should be wary of inserting itself into matters of weighing priorities against resources, which is instead "a problem for the political branches to work out." *See In re Barr Lab'ys* 930 F.2d at 76; *see also Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (agency allocation of funds requires "a complicated balancing of a number of factors which are peculiarly within its expertise"). The Supreme Court endorsed this principle in *Massachusetts v. EPA*, 549 U.S. 497 (2007), where it recognized that review of an agency's refusal to promulgate a rule is "extremely limited" and "highly deferential." *Id.* at 527–28; *see also id.* at 527 ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.").

Petitioners here present no basis for concluding that their own selection of seven categories represents a better use of EPA's resources than the work the Agency is currently engaged in. They do not argue, nor can they, that they have selected the seven most dated regulations, nor that these seven categories have the greatest effect on human health and the environment, nor even that they are the seven highest polluters. (To the contrary, their categories ranged in ranking from ninth to forty-seventh in the concentration ranking in Preliminary Plan 15, 2-ER-456–58, Preliminary Plan 15 at 5-7–9, and from first to thirty-second in Plan 15. 3-ER-616–18, Plan 15 at 5-3–5.) Even their characterization as "the seven industrial categories" is inaccurate—the vast majority of the 59 regulated source categories

are industrial. *See* 3-ER-616–18, Program Plan 15 at 5-3–5 (listing source categories). In fact, the single commonality that Petitioners' seven source categories share is that they included them in this lawsuit.

In short, based on the record before the Agency, it would have been arbitrary for EPA to undertake ELG revisions for Petitioners' seven source categories at the expense of the body of work that the Agency has carefully prioritized based on data from literature reviews, site visits, wastewater sampling, consideration of state and local regulation, potential pollutant reduction achievable, Administration priorities, and other considerations. And reordering the Agency's regulatory agenda here based on Petitioners' generalizable piecemeal attacks would only invite new challenges to successive ELG plans. Ultimately this would subordinate EPA's Congressionally granted discretion over its review methodology to procedures increasingly driven by judicial mandates, and it would frustrate the Agency's strategic pursuit of its most pressing regulatory priorities. The Court should reject Petitioners' bid to introduce such judicial intervention into EPA's administrative process.

## CONCLUSION

The petition for review should be dismissed for lack of subject matter jurisdiction. Alternatively, any reviewable actions before the Court were consistent with the statute and reasonable, and the petition should therefore be denied.

Respectfully submitted,

*/s/ Gus Maxwell*

TODD KIM

Of Counsel:                                    *Assistant Attorney General*

                                               GUS MAXWELL

KRISTA HUGHES                                  *Attorney*

*Attorney*                                     Environment and Natural Resources Division

U.S. Environmental Protection Agency           U.S. Department of Justice

May 17, 2024

DJ 90-5-1-7-22386

## Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**          20-636

I am the attorney or self-represented party.

**This brief contains 13,915 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ Gus Maxwell

**Date**        May 17, 2024